JUAN VILLA RAMIREZ (T-24667)
San Quentin Prison (4-EY-22)
San Quentin, Ca. 94974

E-filing

FILED

SEP 1 1 2007

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

SBA

C 07 4681

Case No. _____

(PR)

Juan Villa Ramirez

       Plaintiff: pro se.

   v.

J. Tilton, Director; R. Ayers, Warden;

      Defendants: et. al.

EXHIBITS IN SUPPORT OF
PLAINTIFF'S §1983, and 42 U.S.C.
§12101 Complaint.

EXHIBITS A.1 through A.39

EXHIBITS B.1 through B.?? (These exhibits could not be attached at this time because
Plaintiff's Capital Attorney LISA SHORT could not mail
them to Plaintiff before he had to meet his statutory
One Year Deadline to file this complaint. Plaintiff
respectfully asks for permission to add these exhibits
later, Along with the Prison Law Office's Letter men-
tioned as EXHIBIT D.6c ).

EXHIBITS C.1 through C.9b.

EXHIBITS D.1 through D.12.

EXHIBITS E.1 through E.14.

1          SUPREME COURT OF THE STATE OF CALIFORNIA

2

3

4

5

6    THE PEOPLE OF THE STATE      )   Kern County Superior
     OF CALIFORNIA,               )   Court No. 76259A
7                                 )
          Plaintiff/Respondent,   )
8                                 )
               vs.                )
9                                 )   7-11-00, 8-14-00, and
     JUAN VILLA RAMIREZ,          )   11-6-00
10                                )
          Defendant/Appellant.    )   VOLUME 6
11   _____  )   Pages 1591 - 1766

12

13

14        APPEAL FROM THE SUPERIOR COURT OF KERN COUNTY
     HONORABLE KENNETH C. TWISSELMAN II, JUDGE PRESIDING
15             REPORTERS' TRANSCRIPT ON APPEAL

16

17                           APPEARANCES:

18   For the Plaintiff/       Edward R. Jagels
     Respondent:              District Attorney, Kern County
19                            By:  MR. ROBERT A. BARTON
                              Deputy District Attorney
20                            1215 Truxtun Avenue
                              Bakersfield, California  93301
21
     For the Defendant/       MR. MICHAEL R. GARDINA
22   Appellant:               Attorney at Law
                              1315 L Street
23                            Bakersfield, California  93301
                                      - and -
24                            MR. J. ANTHONY BRYAN
                              Attorney at Law
25                            1415 18th Street, Suite 620
                              Bakersfield, California  93301
26

27   COPY                     (See Attached Index for Reporters)
                              1415 Truxtun Avenue
28                            Bakersfield, California  93301

          DIANA L. DYSON - CSR NO. 10781        A-1

1591

1    BAKERSFIELD, CALIFORNIA; TUESDAY, JULY 11, 2000; A.M.

2    DEPARTMENT 8            KENNETH C. TWISSELMAN II, JUDGE

3                    --oOo--

4        THE COURT:  I'll confirm what the file reflects,

5    and that is that the Co-defendant Garza entered a plea

6    last week and the trial and proceedings have been --

7    trial-related proceedings have been vacated.

8        Confirming that, Mr. Barton?

9        MR. BARTON:  That's correct.

10       THE COURT:  Proceeding now solely as to the

11   Defendant Ramirez, the issues remaining today are the

12   motion to continue the trial which we had previously

13   discussed on the record.  That continued that matter

14   until today to have further medical expert

15   availability, et cetera.  And we have a couple of other

16   things, but I assume that the motion to continue is the

17   first matter to take up.

18       Is that your request, Mr. Bryan?

19       MR. BRYAN:  Yes, your Honor.

20       THE COURT:  You are going to be handling the

21   motion?

22       MR. BRYAN:  That's correct.

23       THE COURT:  Do you want to put on this evidence

24   first?

25       MR. BRYAN:  I do.

26       THE COURT:  Anything else before we take evidence

27   on the motion, Mr. Barton?

28       MR. BARTON:  No, your Honor.  That was the only

1    thing I had on calendar for today.

2           I'm not sure.  Are we talking about scheduling?

3           THE COURT:  I think we just discussed the status

4    conference in general, as well, then.

5           MR. BARTON:  Okay.  We didn't have any other

6    motions.  I wasn't prepared on any other motions.

7    That's why I was concerned when the Court said....

8           THE COURT:  Very good.  Let's call the witness,

9    Mr. Bryan.

10          MR. GARDINA:  Dr. Estner, please, your Honor.

11          THE COURT:  Step forward and be sworn, please.

12          THE CLERK:  You do solemnly swear that the

13   testimony you shall give in the matter now pending

14   before the Court shall be the truth, the whole truth,

15   and nothing but the truth, so help you God.

16          THE WITNESS:  I do.

17          THE CLERK:  Please be seated.

18               STEPHEN MILES ESTNER, M.D.,

19   called as a witness by counsel for the Defendant,

20   having been first duly sworn, testified as follows:

21                DIRECT EXAMINATION

22   BY MR. BRYAN:

23          Q.    Please state and spell your full name, sir.

24          A.    First name is Stephen with a p-h.  Middle

25   name Miles.  Estner, E-s-t-n-e-r.  Title is M.D.

26          Q.    Doctor, what is your -- the nature of your

27   participation, if any, in this case?

28          A.    I was consulted by you to examine

1    Mr. Ramirez and report to you as to medical conditions

2    he might or might not have pertinent to the matters

3    pending.

4              Q.    Have you been appointed by the Superior

5    Court of Kern County to assist me and the defendant,

6    Juan Ramirez, in this case?

7              A.    Yes.

8              Q.    And do you recall when you were appointed?

9              A.    Early April of this year.

10             Q.    Okay.  And what did you do after you found

11   out you had been appointed?

12             A.    Requested written materials pertinent to

13   the case and went out to examine Juan.

14             Q.    And did you find anything of significance

15   or note when you examined the defendant, Juan Ramirez?

16             A.    Yes.

17             Q.    Where did the examination take place, sir?

18             A.    Lerdo Pretrial.

19             Q.    What did you discover?

20             A.    In observing Mr. Ramirez, I noticed that he

21   had a surgical scar on his right lower neck, above the

22   collar bone.  Of course, I asked him about that.

23             THE COURT:  Can we establish the date of this?

24             MR. BARTON:  I think he said it was in April.

25             THE COURT:  The date, please?

26             THE WITNESS:  The exam was April 23.

27   BY MR. BRYAN:

28             Q.    Okay.

DIANA L. DYSON - CSR NO. 10781    A-4

1    A.    First exam.

2    Q.    And, of course, you have seen Mr. Ramirez

3  since then; is that correct?

4    A.    Yes.

5    Q.    Did you become aware, during this period of

6  time, that there had been a surgery?

7    A.    Yes.

8    Q.    And did you acquaint yourself with that

9  surgery?

10    A.    Yes.

11    Q.    And did you request records of that surgery?

12    A.    Yes.

13    Q.    And when did you receive those?

14    A.    Early June.

15    Q.    Okay. So, basically, it took them nearly

16  two months to respond to your request?

17    A.    The Kern Medical Center was pretty

18  expeditious. I have yet to hear from Lerdo and some of

19  the other places I've requested records.

20    Q.    Do you remember when you requested the

21  records?

22    A.    May. I saw him on the 23rd. So within

23  about a week of that I sent out releases of records,

24  signed releases of records, and cover letters.

25    Q.    Okay. And was it early June when you

26  received the response to those?

27    A.    Yeah. It took about two weeks.

28    Q.    Okay. After you were able to read the

1  records of the surgery, you had seen Juan approximately

2  how many times?

3       A.    Two.

4       Q.    Okay.  What did your observations and the

5  records indicate?

6       MR. BARTON:  Objection.  Lacks foundation,

7  unless he's going to admit those records.

8       MR. BRYAN:  I believe they are part of the

9  motion, your Honor.

10       THE COURT:  Are you asking him for his opinion,

11  or are you asking him what the records said?

12       MR. BRYAN:  I'm asking him what he was able to

13  learn from the records and his examinations, and I will

14  be referring to those records which are attached to the

15  motion.

16       THE COURT:  Why don't you lay that foundation.

17       MR. BRYAN:  I'm sorry?

18       THE COURT:  Why don't you lay the foundation that

19  those are the records that the doctor is referring to,

20  and then proceed from there.

21       MR. BRYAN:  May I have the motion, your Honor.

22  BY MR. BRYAN:

23       Q.    Do you have a copy of those records with

24  you, Doctor?

25       A.    Yes.

26       Q.    And have you had an opportunity to --

27       MR. BARTON:  Objection, your Honor.  I'm going to

28  ask that they be marked so we have some reference.  We

1  need to keep a record.  That's my only objection.  I'm

2  not objecting to Mr. Bryan entering the records as

3  evidence, but just because they are attached to the

4  motion doesn't make them evidence.  We need to have

5  them marked so we can refer to them.

6      MR. BRYAN:  Your Honor, I don't mind marking the

7  copy that Dr. Estner has.  But I would ask that when it

8  comes to moving them into evidence that I be allowed to

9  use the records that are attached to the motion.

10      THE COURT:  Well, any objection to the Court

11  treating the exhibits that are attached to the motion

12  as evidence?

13      MR. BARTON:  The problem is I think that's not

14  the complete set.  The set that I was provided by

15  Mr. Bryan seems to have more pages than what was

16  attached to the exhibit in the motion.  And I'm not

17  sure if it was just nurse's notes or something that is

18  taken out, or what.  I think the doctor needs to look

19  at what is in the exhibit and see if what's in the

20  exhibit is what he looked at.

21      MR. BRYAN:  May we mark this, please.

22      THE COURT:  If we mark that, that will become the

23  exhibit.

24      MR. BRYAN:  Okay.

25      THE CLERK:  Defendant's Exhibit A marked for

26  identification.

27      THE COURT:  Do you need to see this, Counsel?

28      MR. BRYAN:  I showed it to him, your Honor.

1   MR. BARTON:  I've seen the front sheet.  If it's
2   the same as what he provided to me, I know what's in
3   there.
4   BY MR. BRYAN:
5   Q.    I'm going to ask you to look at defense
6   next in order in front of you, Doctor, and ask if you
7   can identify that.
8   A.    I have about 20 pages labeled Defendant's
9   Exhibit A, and it's the materials I received from Kern
10   Medical Center on requesting Juan Ramirez's records of
11   treatment there.
12   Q.    Okay.  And those are the records you
13   referred to that you say you received in early June?
14   A.    Yes.
15   Q.    Have you had an opportunity to read those
16   records?
17   A.    Yes.
18   Q.    Now, Doctor, what is the nature of your
19   qualifications?
20   A.    Medical degree from University of
21   Pittsburg, 1984.  Internship, residency, and chief
22   residency in general surgery with the Albert Einstein
23   College of Medicine in New York, 1984 to 1989.
24   Publication in several first-rate peer review
25   cardiovascular journals.  Presentation at the annual
26   meeting of the American College of Surgeons regarding
27   vascular surgical issues.
28   And then subsequently, as part of my surgical

1    training and testifying in penetrating trauma cases,

2    I eventually transitioned my career into that of a

3    forensic psychiatrist.  But I believe I have

4    substantial medical and surgical background to address

5    the issues.

6        Q.    Have you done surgeries?

7        A.    Somewhere in between 5300 and 6,000

8    operations, yes.

9        Q.    So you have performed over 5300 surgeries?

10       A.    Yes.

11       Q.    And where would those have been, primarily?

12       A.    Oh, the hospitals of Albert Einstein

13   College of Medicine, including Montefiore --

14   M-o-n-t-e-f-i-o-r-e -- Hospital, North-Central Bronx

15   Hospital, the Bronx Municipal Hospital Center, and the

16   Albert Einstein College of Medicine.

17       Q.    You mentioned cardiovascular surgery.  Are

18   you familiar with that portion of surgery?

19       A.    Yes.

20       Q.    And do you have any special expertise in

21   that?

22       A.    I believe so.

23       Q.    What would that be, sir?

24       A.    That was certainly the concentration of my

25   surgical practice.  My first publication in 1985 was

26   in The Annals of Thoracic Surgery.  My last surgical

27   publication in 1990 was in The Journal of

28   Cardiovascular Surgery, and my presentation to the

1    American College of Surgeons involve cardiovascular

2    techniques.

3        Q.    Are you published in this area?

4        A.    Yes.  I've gone through that.  I have some

5    of the articles here.

6        Q.    And have you brought those articles with

7    you?

8        A.    Yes.

9        Q.    Which would be the first one that you would

10   wish to refer to, Doctor?

11       A.    An original article reprinted from

12   The Annals of Thoracic Surgery in 1985.  I have a

13   reprint here.

14       Q.    Thank you.

15       MR. BARTON:  Go ahead, Counsel.  You don't have

16   to wait for me.

17       MR. BRYAN:  May this be marked defense next in

18   order, please.

19       THE CLERK:  Defendant's Exhibit B marked for

20   identification.

21       MR. BRYAN:  Thank you.

22   BY MR. BRYAN:

23       Q.    Asking you to look at Defendant's B, sir,

24   and ask you what that particularly addresses.

25       A.    It's a published paper of research I did

26   at medical school regarding patients with cystic

27   fibrosis -- c-y-s-t-i-c f-i-b-r-o-s-i-s -- who

28   sometimes developed pulmonary complications of coughing

1600

1    up blood, at which time it's important to perform an

2    arteriogram -- a-r-t-e-r-i-o-g-r-a-m -- and verify as

3    to whether the collateral vessels that are causing the

4    bleeding involve important structures, making a

5    decision as to whether one can just occlude the

6    arteries that's bleeding through a catheter or have to

7    resect a portion of the lung where the bleeding is

8    taking place.

9            Q.    Have you published any other articles in

10   this area?

11           A.    Yes.

12           Q.    And what would that be, sir?

13           A.    This is a publication of research presented

14   to The American College of Surgeons in 1987, in

15   San Francisco.  And I have a copy of that article and

16   the manual in which it is published.

17           MR. BRYAN:  Defense next in order, please.

18           THE COURT:  Do you want to mark them separately?

19           MR. BRYAN:  Your Honor, it makes no difference to

20   me.  That's up to the Court or clerk.

21           THE COURT:  We can staple them and make them one

22   exhibit, if no objection.

23           MR. BARTON:  No objection.  I don't think these

24   are being offered for evidence on this issue as opposed

25   to his qualifications.

26           THE CLERK:  Defendant's Exhibit C marked for

27   identification.

28           MR. BRYAN:  Thank you.

A-11

BY MR. BRYAN:

Q.    Ask you to look at Defendant's C for a moment, sir.  And, if you can, give us a brief description of that.

A.    Yes.  The aortic arch is part of the cardiovascular system that immediately exits the heart that is sometimes subject to aneurysms which are almost uniformly fatal.  At the surgical laboratories at the Albert Einstein College of Medicine, myself and two other surgeons developed a technique for rapid replacement of the aortic arch.

So without having to put somebody on cardiac arrest and cardiopulmonary bypass and do a procedure that takes hours with a high mortality rate, we developed a prosthesis which we manufactured which could be rapidly inserted in the aneurysmal aorta and then ligated in place with simple sutures in a matter of minutes, to be a rapid lifesaving substitute for the otherwise lengthy surgery.  And this was presented and subsequently became a surgical technique.

Q.    Adopted by other surgeons?

A.    Yes.

Q.    Any other articles, sir?

A.    Additional research on that same subject was subsequently published in The Journal of Cardiovascular Surgery in 1990.

THE COURT:  Mr. Bryan?

MR. BRYAN:  Yes, sir.

A-12

1602

```
 1        THE COURT:  Stapled together and marked as one
 2   exhibit.
 3        MR. BRYAN:  Thank you, your Honor.
 4        THE CLERK:  Defendant's Exhibit D marked for
 5   identification.
 6        MR. BRYAN:  Thank you.
 7   BY MR. BRYAN:
 8        Q.   Ask you to peruse it for a moment, sir, and
 9   please give us a brief description.
10        A.   I mostly discussed it already.  It's just
11   the larger picture of the full research that we did in
12   this area.
13        Q.   Where was that published?
14        A.   Journal of Cardiovascular Surgery.
15        Q.   Is that an accepted journal in your
16   profession?
17        A.   It's what we call peer reviewed, and that
18   means the highest quality journal; that the materials
19   will be reviewed by a group of other possibly more
20   qualified individuals who would decide if this is
21   something useful to the readers or helpful to the
22   field.  So it's a first-run journal, yes.
23        Q.   Any other articles?
24        A.   These are the articles that I published in
25   that area.  I brought some other documents, but those
26   are the actual publications.
27        Q.   What are those documents, sir?
28        A.   I brought my graduation certificate from
```

A-13

1   the surgery training program at Einstein.

2          Q.     I hope that's a copy?

3          A.     It is.

4          Q.     Thank you.

5          MR. BARTON:  That's fine.

6          THE CLERK:  Defendant's Exhibit E marked for

7   identification.

8          MR. BRYAN:  Thank you.

9   BY MR. BRYAN:

10         Q.     Anything else, sir?

11         A.     Finally, yes.

12         Q.     What is that?

13         A.     I thought it was pertinent.  My professor

14  of head and neck surgery, which I think is an issue

15  here, published an atlas which I asked him to simply

16  inscribe for me.  He wrote an inscription; so I brought

17  a copy of the title page in the inscription.

18         Q.     He is a really known expert in your field?

19         A.     Oh, yes.

20         Q.     And there was a book he published and wrote

21  and had published that he was inscribing for you?

22         A.   Yes.

23         MR. BRYAN:  Can we staple that, please, as well.

24  BY MR. GARDINA:

25         Q.     And he wrote a personal comment to you?

26         A.     Unexpectedly, yes.

27         THE CLERK:  Defendant's Exhibit F marked for

28  identification.

A-14

1604

1      MR. BRYAN:   Thank you.

2   BY MR. BRYAN:

3      Q.    Now, sir, have you ever given any kind of

4   instructions or advice to prosecutorial agencies?

5      A.    Oh, yes.

6      Q.    How many times?

7      A.    Gosh, I think about a third, maybe a third

8   of my cases come from prosecuting attorneys.

9      Q.    And that's where your advice is sought by

10  prosecuting attorneys?

11     A.    Yes.  I mean, there are times when I'm

12  purely court appointed and either the defense attorney

13  or prosecuting attorney might ask me for advice.  But

14  I'm talking about primarily being retained by

15  prosecuting attorneys to provide consultation.

16     Q.    That's what I'm asking you about.  You have

17  been retained on numerous occasions by prosecutors; is

18  that correct?

19     A.    Yes.

20     Q.    Have you ever given talks or speeches or

21  instructions to groups of prosecutors?

22     A.    Yes.

23     Q.    And please relate the nature of that,

24  briefly.

25     A.    Yes.  Having done my forensic fellowship

26  at Atascadero State Hospital in San Luis Obispo and

27  deciding that I could probably cover some jurisdictions

28  around there, I gave talks to defense offices and

DIANA L. DYSON - CSR NO. 10781            A-15

```
1    prosecuting offices and in those jurisdictions part as
2    a way to familiarize myself with them and as to
3    introduce my style of work.
4         Since that time, I've given talks to bar
5    associations and Attorney Generals' offices all over
6    the state.
7         Q.    So you have given talks to the Attorney
8    General's Office?
9         A.    Yes.
10        Q.    Of the State of California?
11        A.    Yes.
12        Q.    Okay.  When did you first find out or
13   discover that Juan Ramirez had had surgery at some time
14   since his incarceration?
15        A.    April 23 of this year.
16        Q.    And you did point to an incision on his
17   neck; is that correct?
18        A.    An incision on his neck and a mass on his
19   tongue.
20        MR. BRYAN:  Ask that this be marked People's next
21   in order.
22        MR. BARTON:  How about defense?
23        MR. BRYAN:  I'm sorry.  Defense.
24        THE CLERK:  Defendant's Exhibit G marked for
25   identification.
26        MR. BRYAN:  Thank you.
27   BY MR. BRYAN:
28        Q.    Ask you to look at Defense G, sir, and tell
```

1  me if that exhibit discloses anything that you
2  recognize.
3          A.      Yes.
4          Q.      What is that, sir?
5          A.      It's roughly centered on the right side of
6  Mr. Ramirez's neck and indicates about a three to four
7  centimeter surgical scar over his sternocleidomastoid
8  muscle.
9          Q.      And is that scar depicted in that
10  photograph consistent with the information contained in
11  the KMC medical report that you received in June?
12          A.      Yes.
13          Q.      In other words, that scar does appear to be
14  the one that was resulting from the surgery described
15  in that medical report?
16          A.      Well, there was a scar after the initial
17  surgery in February '99, and then there was reoperation
18  in December of '99 that resulted in excision of the
19  original scar.  So the second operation was performed
20  roughly through the same incision, and there's one scar
21  resulting from two operations.
22          MR. BRYAN:  May these be marked defense next in
23  order, please.
24          THE CLERK:  Defendant's Exhibits H through K are
25  marked for identification.
26          MR. BRYAN:  Thank you.
27  BY MR. BRYAN:
28          Q.      I'm going to ask you to peruse

1    Defendant's H through K for a moment, sir.

2        A.    Okay.

3        Q.    Do you recognize anything in those

4    photographs?

5        A.    Yes.

6        Q.    What is that, sir?

7    THE COURT:  Go one by one.

8    MR. BRYAN:  Sure.

9    THE WITNESS:  Yes, sir.  Exhibit H is a

10   left-lateral photograph depicting Mr. Ramirez with

11   open mouth and tongue protruding and two to three

12   centimeter, looks like, mass distorting and emerging

13   from the side of his tongue, with a blue-ish tint

14   suggesting possible vascular consistency.

15       Q.    Could you please explain that, your

16   conclusion as of a vascular inconsistency.

17       A.    Consistency.

18       Q.    Consistency?

19       A.    Yeah.  The surgeries in the neck involved

20   what was initially thought to be a venous tumor and

21   then thought to be what we call a hemangioma --

22   h-e-m-a-n-g-i-o-m-a -- which is an abnormal cluster of

23   vessels with connections between the arteries and the

24   veins.  And it appears that the lesion in the tongue is

25   the same consistency of vascular lesion of abnormal

26   arteriovenous connections.  So we talked about each.

27   And you can see the tint.  And you look at it grossly,

28   it's visible, because color is sometimes difficult with

DIANA L. DYSON - CSR NO. 10781        A-18

1608

1  photographs.

2      Q.  Have you ever seen that mass in person?

3      A.  Yes.

4      Q.  And when did you first see that mass, sir?

5      A.  It's not uncommon.  I've probably seen

6  hundreds of them between 1984 and 1999.

7      Q.  I meant on Mr. Ramirez.

8      A.  Oh.  First observed April 23.  Oh, I saw

9  the scar and asked him about it and said do you have

10  any other such masses.  And he stuck his tongue out,

11  and there it was.

12      Q.  Is there any reference to the tongue mass

13  in the KMC report of the surgery?

14      MR. BARTON:  Objection.  Vague.  Which one?

15      MR. BRYAN:  Either one.

16      THE COURT:  You may answer.

17      THE WITNESS:  There's no indication of an

18  appreciation of the tongue mass in the surgeries or the

19  examinations contained in the Kern Medical records.

20  BY MR. BRYAN:

21      Q.  Is there any indication in the Kern Medical

22  records that there was preoperative testing?

23      A.  There's no indication that there was any

24  kind of workup other than palpation and surgery.

25      Q.  And where was the mass that was operated on?

26      A.  It was thought to be involving the external

27  jugular vein, which is the vein over your neck muscle

28  that you sometimes see stand out when people shout or

A-19

1    sing.

2         On operation, it was found to go deep and I

3    believe emerged from the internal jugular vein, but it

✳  4    was never completely excised.

5         Q.    And there was a second surgery?

6         A.    Yes.  The mass recurred, and there were

7    symptoms of pain and headaches.  And so the first

8    surgery February 17, '99; second surgery December 8,

9    '99.

10         Q.    Was there any preoperative testing done for

11    the second surgery?

12         A.    Right.  Only blood work.  Nothing specific

13    to the mass.

14         Q.    And what about any postoperative studies?

15         A.    Between the two surgeries, no additional

16    studies were done other than the pathologic examination

17    of the tissue removed.  And subsequent to the second

18    surgery, no indication of the additional studies.

19         Q.    Is that standard operating procedure to

20    perform these kinds of surgeries without testing?

21         A.    No.

22         Q.    I'm sorry?

23         A.    No.

24         Q.    Would you please elaborate on that.

25         A.    Yes.  In discovering a mass, one

26    palpates carefully to try to determine the nature and

27    location -- is the mass attached to the skin, which

28    this one clearly was not.  Then one typically proceeds

1610

1  with either an X-ray or an ultrasound which will tell

2  you if the mass is vascular or solid.  Then, if it's

3  found to be vascular, one typically does imaging

4  studies of the vessels to try to determine the origin

5  and extent of the tumor preoperative.

6       Q.    And that was not done in this case, is that

7  your testimony?

8       A.    Not before the first surgery or before

9  reoperating on the recurrence.

10      Q.    Is that below the standard of care?

11      MR. BARTON:  Object, your Honor.  We are not here

12  contesting the practice of any of the doctors.  I

13  think it's only relevant as much as it goes to the

14  continuance and the need for some testing.

15      MR. BRYAN:  And I think that it is relevant on

16  the issues as to whether or not this matter is being

17  properly handled.

18      MR. BARTON:  Well, objection, your Honor.  That's

19  not before the Court whether or not he's receiving

20  adequate or expert care from Kern Medical Center.

21  That's not the issue before the Court.

22      MR. BRYAN:  Your Honor, I object.  Kelly vs. Borg

23  makes it very clear that the Eighth Amendment entitles

24  a prisoner to the standard of care in the community

25  that is proper for his medical problems.

26      THE COURT:  Let me interject.  The focus here is

27  whether we are going to continue this trial for good

28  cause.  And if you want to elicit some opinions from

1    the doctor that the defendant requires further

2    treatment or procedures, et cetera, and if his opinion

3    is based in part upon what has transpired in the past,

4    it may be relevant.

5         What I don't want to turn this into is some type

6    of a negligence issue involving a provider in the

7    past.  If the witness has an opinion that relates to

8    the course of treatment or as it affects the

9    defendant's ability to go to trial, he can state his

10   opinion and what the basis for it is.

11        Why don't you approach it that way.

12        MR. BRYAN:  Thank you, your Honor.

13   BY MR. BRYAN:

14        Q.    Sir, do you have an opinion as to the

15   necessity of testing from that time to this time?

16        A.    Yes.

17        Q.    What would that opinion be, sir?

18        A.    Additional tests are necessary.

19        Q.    And are these tests of a compelling nature?

20        MR. BARTON:  Objection.  Vague.

21        THE COURT:  Sustained.

22   BY MR. BRYAN:

23        Q.    What is the necessity of these tests?

24        A.    Specifically pertinent to the case, I

25   believe the masses need to be delineated as to what

26   they are, how many of them they are, and where they

27   are.  And I believe this might have bearing on

28   defendant's mental state at the time of the alleged

1   offense and possible prognostic information.

2       THE COURT:  To interject, the only mass I recall

3   is the tongue mass.

4       MR. BRYAN:  We will get to those, your Honor.

5   BY MR. BRYAN:

6       Q.    Have you located yourself, Doctor, other

7   masses since your involvement in this case, since the

8   surgery?

9       A.    Yes.

10      Q.    And what have you located in that regard,

11  sir?

12      A.    There are other small palpable masses in

13  the neck.  And given one's complaint of headaches, I'm

14  particularly concerned about possible masses in his

15  head, in his brain.  It's a common site of

16  arteriovenous malformations.

17      THE COURT:  Your voice is dropping, Doctor.

18      THE WITNESS:  I'm also concerned about possible

19  masses in the brain, which is a common site of

20  arteriovenous malformations because the brain is a very

21  vascular structure.

22      MR. BARTON:  Object to the second remark as being

23  nonresponsive.  He asked those that he actually felt.

24  The doctor testified to a few in the neck.  He's now

25  speculating to some in the head.  That's nonresponsive

26  to the question.

27      THE COURT:  Overruled.  Move on.

28  BY MR. BRYAN:

A-23

1613

1    Q.    Doctor, are you saying have you been

2  able -- do you have any idea how many you have palpated

3  in the neck?

4    A.    There are numerous.  I'd say five or six at

5  least.

6    Q.    And would these be near the ones that were

7  operated on -- or the one that was operated on?

8    A.    They are.

9    Q.    And is there any mention of those masses in

10  the surgical reports from the KMC operation?

11    A.    No.

12    Q.    When you have found what you have found --

13    THE COURT:  Let's establish the date of this

14  palpation by the doctor.

15    THE WITNESS:  April 23.

16    Since that time, I've repalpated, because the

17  masses seem to change somewhat in size and number over

18  time.  But the primary examination was April 23.

19  BY MR. BRYAN:

20    Q.    Does the location and the nature of what

21  you have been able to palpate create a suspicion that

22  there may be some on other parts of the head, including

23  the brain?

24    MR. BARTON:  Well, objection, your Honor.  Asked

25  and answered over my previous objection that that's

26  what he stated.

27    MR. BRYAN:  An expert can always explain his

28  answer, your Honor.

DIANA L. DYSON - CSR NO. 10781      *A-24*

1614

1    THE COURT:  Suspicion isn't a medical term.

2  Rephrase.

3  BY MR. BRYAN:

4    Q.    Do you have a medical belief, a belief

5  based on your expertise and your training, that this

6  may mean that there are additional masses in the head

7  and brain?

8    A.    Yes.

9    Q.    Why would that be, sir?

10    A.    We talk about the distribution.  The

11  largest mass was excised from the right neck.  There

12  are additional smaller masses which come and go and

13  change inside and through the neck.  There's a large

14  mass on the tongue.  And it's a reasonable probability

15  that there may be masses elsewhere in the head and

16  specifically in the brain.

17    Q.    Now, are these masses also properly

18  referred to as tumors?

19    A.    Yes.

20    Q.    You have indicated that if these situations

21  existed that could have impinged the mental state three

22  years ago?

23    A.    Yes.

24    Q.    Do they possibly also mean that there is

25  any kind of a pending emergency as we sit here?

26    A.    I would refer to it as urgent rather than

27  emergence.  I wouldn't rush Mr. Ramirez to the

28  hospital now, but, in the course of the short-term, he

1615

1  should be examined for the possibility of these

2  malformations in the brain because of the possibility

3  of rupture and illness or fatality.

4       Q.    What tests should, in your opinion, be

5  performed presently?

6       A.    The first test should be a CAT scan with

7  intravenous contrast of the head and neck.

8       Q.    Did you prepare -- did you request

9  authorization from the Court, through me, for such

10  testing?

11      A.    I did.  I asked for an MRI scan, but I

12  think a CAT scan will be fine.

13      MR. BRYAN:  Marked next in order, please.

14  Defense next in order.

15      THE CLERK:  Defendant's Exhibit L marked for

16  identification.

17  BY MR. BRYAN:

18      Q.    Showing you defense next in order, an order

19  of the Superior Court of Kern --

20      MR. BARTON:  Your Honor, just so we are clear

21  on the record, I'm assuming, because counsel is

22  offering this, that none of this is any more privileged

23  information and we are not going to have a problem down

24  the road.  I'm assuming that any privilege regarding

25  this has been waived be his client.

26      MR. BRYAN:  Your Honor, that is completely

27  untrue.  This is a motion to continue.  It's not a

28  trial.  It's a motion to continue that has been

1    necessitated by counsel's obstinate --

2         THE COURT:  Don't use that kind of language,

3    Mr. Bryan.

4         MR. BRYAN:  Your Honor --

5         THE COURT:  Don't make personal attacks on

6    counsel.

7         MR. BRYAN:  Your Honor, this Court hasn't

8    admonished Mr. Barton for the attacks on my colleague

9    and I in his response to my motion to continue this

10   case.  My motion to continue this case was eminently

11   reasonable, and we were personally attacked.  He hasn't

12   been admonished for that, nor do I --

13        THE COURT:  If Mr. Barton personally attacks you,

14   I am certainly prepared to admonish him.

15        MR. BRYAN:  We do not have to waive our right to

16   confidentiality to try to get this man treated, for

17   treatment that he obviously needs.  And to oppose it

18   now, counsel is requiring that I have to give up all of

19   my confidential rights with my client in order to get

20   him the treatment he needs.  And I don't think that is

21   required.

22        THE COURT:  Let me just cut this short.  I

23   understood Mr. Barton to be raising the question as to

24   whether there had been any type of a waiver of

25   confidentiality.  I think waivers can be express or

26   implied.  And I think it's sufficient if you just

27   confirm that you have considered that issue, your

28   client is aware of that issue, and you are prepared to

1  go forward.  And if there is an implied waiver, so be

2  it.

3       MR. BRYAN:  There's no question Dr. Estner is

4  going to be subject to cross-examination, and he's

5  going to have to explain his actions.  But beyond

6  that -- and his opinions.  But beyond that, no, I'm

7  certainly not agreeing to any waiver.

8       MR. BARTON:  Judge, my only objection --

9       MR. BRYAN:  I am asking -- as you can see in my

10  response, I have asked also for an in camera hearing

11  today, where I intend to give voluminous amounts of

12  information to this Court for the continuance, which is

13  entirely allowed by the law.  And because we need a

14  continuance, we do not have to be forced to give up my

15  client's confidential rights.

16       MR. BARTON:  Your Honor, my objection, so we can

17  cut this short, was only to this article that he just

18  put in front of me that are usually confidential.  They

19  are ex parte.  I'm not a party to these.  He's now

20  blowing it out of proportion.  My objection was simply

21  as to that document.

22       There is not a problem as long as counsel is

23  saying that he is waiving any confidentiality in that

24  particular order, which are made confidentially,

25  without the prosecutor's knowledge.  That's all I

26  objected to.  I don't quite know where Mr. Bryan is

27  going, but that's --

28       THE COURT:  Well, if you made an objection, I

1  didn't understand it as an objection.  I thought you

2  were just raising the question as to whether there was

3  a waiver.

4     MR. BARTON:  That's right.  I was just raising

5  that question.  I don't want to have, later on, some

6  appellate counsel to Mr. Bryan saying there was some

7  problem with this -- he had never talked to his client

8  or there had never been a waiver of an ex parte order.

9  That's all I was asking for.

10     MR. BRYAN:  I will state for the record --

11     THE COURT:  One thing I want to address now,

12  Mr. Barton.  I am concerned we take turns speaking.  I

13  am going to ask that you wait until other counsel has

14  finished before you respond or otherwise address the

15  Court.  Obviously, there are times when you need to

16  make an objection, et cetera.  But let's keep that in

17  mind.

18     MR. BARTON:  Yes, your Honor.

19     THE COURT:  Mr. Bryan.

20     MR. BRYAN:  I have made a decision it is

21  necessary, because I anticipate -- and having read

22  counsel's opposition, I anticipate that there is going

23  to be a claim that we have caused these delays.

24     And I want to make sure that this Court

25  understands that we have, at every single stage, sought

26  to get this medical condition or this mental condition

27  readdressed and tested and properly treated.

28     And, therefore, I am going to have this order for

```
 1   testing marked that we sought in a timely fashion, and
 2   I'm going to examine the doctor about it.  Counsel can
 3   cross-examine.
 4         If counsel is trying to get me to agree that I
 5   have waived all ex parte matters regarding this medical
 6   condition, I certainly don't agree to that.  This is
 7   being admitted for the sole issue -- or I should say
 8   offered for the sole purpose to show that we have
 9   sought timely -- sought testing.
10         And I am now going to ask the doctor, Doctor,
11   have you --
12         THE COURT:  Well, let me --
13         MR. BRYAN:  Surely.
14         THE COURT:  Let me make sure we all know where we
15   stand.  Obviously, Mr. Bryan, you are proceeding with
16   the understanding that Mr. Barton is going to
17   cross-examine within the scope of issues that you bring
18   up on direct.
19         MR. BRYAN:  Of course.
20         THE COURT:  And doesn't that basically address
21   your concern, then?
22         MR. BARTON:  In fact, the record he just made was
23   the only record I was asking for.  As counsel knows,
24   this case will be scrutinized, and we have to make sure
25   there is a record.  That was all I was asking for.
26         THE COURT:  Very good.  I think we can move on.
27         I want to have one thing clarified, Mr. Bryan.
28   You made reference to a request for in camera hearing,
```

1620

1    and I was trying to recall where in your papers that

2    was addressed.

3         MR. BRYAN:  It's in that motion somewhere.  I

4    know it's in there somewhere.

5         THE COURT:  Well --

6         MR. BRYAN:  Anyway, it is.  But if the Court --

7    it may be in the second motion, the supplement.  But

8    it's there.

9         THE COURT:  Well, is there something you have

10   asked me to do in an in camera I have ruled on or not

11   ruled on?

12        MR. BRYAN:  Your Honor, there are reasons for

13   this continuance that I do not want to bring up in open

14   court.  And I am entitled to do that ex parte,

15   particularly in a death penalty case.

16        THE COURT:  At what point do you intend to ask

17   for that in camera hearing?

18        MR. BRYAN:  When we are all through with

19   Dr. Estner.  And if there's a stipulation to the

20   photographs, then we don't need Mr. Hall.  But if

21   there's no stipulation as to when and where the

22   photographs of the tongue were taken, then we need

23   Mr. Hall.  And that would take one minute for Mr. Hall

24   to testify as to when and where he took the photographs

25   of Defendant Ramirez's tongue, and then I would be

26   asking for the ex parte.

27        MR. BARTON:  I'm sorry.  I thought he was done.

28        I was simply going to offer the stipulation as to

DIANA L. DYSON - CSR NO. 10781    A-31

1   the photographs.

2        As I understand it, the witness has already

3   testified that is an accurate depiction of what he saw

4   in Mr. Ramirez's mouth on April 23rd.  So I don't

5   really care when they were taken if they accurately

6   depict what he saw on the 23rd.  I'll accept that.  And

7   I'll accept the foundation for the photograph.

8        THE COURT:  You will stipulate to foundation as

9   far as the photograph?

10        MR. BARTON:  Yes.

11        THE COURT:  All right.  That would be accepted.

12        MR. BRYAN:  And as soon as we are through with

13   Dr. Estner, that's when I would be asking for the

14   in camera.

15        THE COURT:  And before we start with the

16   in camera, I'd like you to specifically point me to the

17   portion.  We'll finish with Dr. Estner first, and then

18   we will get to the written motion.  I want to make sure

19   I understand what the request was.  I don't recall the

20   in camera request.

21        Go ahead with Dr. Estner.

22   BY MR. BRYAN:

23        Q.    Did you receive from me a fax of that

24   authorization for testing?

25        A.    I did receive a fax of the Defendant's

26   Exhibit L, which is an authorization for additional

27   testing dated June 29.

28        Q.    Okay.  And what did you -- what have you

1622

1   done pursuant to that authorization, if anything?

2       A.      Scheduled Mr. Ramirez for CAT scan of his

3   head.  Spoken to the Lerdo treatment team.

4       Q.      Now, had you become aware -- since this

5   controversy began as to whether or not there should be

6   testing, are you aware of any attempts by any medical

7   persons at KMC or Lerdo to perform additional tests?

8       A.      Other than the pathologic examination of

9   the tissues removed at surgery, there had not been.

10      Q.      Okay.  Have you had any conversations with

11  any portion of the Lerdo or KMC medical staff?

12      A.      Yes.

13      Q.      And would that be Dr. Mostofi?

14      A.      Yes.

15      Q.      And did that doctor relate to you any

16  desire for testing?

17      A.      Yes.

18      THE COURT:  Which staff is he on?

19      THE WITNESS:  Dr. Mostofi is one of the primary

20  medical doctors at Lerdo Pretrial.

21  BY MR. BRYAN:

22      Q.      What did he tell you, sir?

23      A.      That he thought that the mass should be

24  biopsied and that he was going to look in his records

25  to see where that was in the process and get back to me.

26      Q.      And did you request from him any tests or

27  reports that he had generated regarding this matter?

28      A.      Well, back in late April, early May, I had,

A-33

1  without contacting him directly, requested the Lerdo

2  treatment records but then yesterday specifically

3  verbally asked him again and resent him the release of

4  records, asking for the most current treatment records

5  on Mr. Ramirez.  I have not received anything from them

6  yet.

7      Q.    Okay.  Are you aware of any more testing

8  that has been performed by anybody since the last

9  surgery or since the surgeries, such as MRIs,

10  CAT scans?

11      A.    Oh, yes.

12      Other than the path exam of the tissues, no.

13  I think Dr. Mostofi examined himself and gave the

14  impression it might be a vascular lesion, but that's an

15  examination, a form of a test but not what you are

16  thinking of and any studies.

17      Q.    Have you read the pathological report

18  regarding those surgeries?

19      A.    Yes.

20      Q.    Are you able to form any opinions as to the

21  nature of that test?

22      A.    Yes.

23      Q.    And as to the results?

24      A.    Yes.

25      Q.    What are those, sir?

26      A.    The tissues were examined after each of the

27  surgeries, and the examination of the tissues doesn't

28  reflect the surgical observations.  In other words,

1624

1   the doctors, both times, thought it was a venous or

2   arteriovenous lesion, and both of the pathologic

3   specimens are returned as fibrous and fatty tissues.

4   No mention of vascularity.

5          Q.    Doctor, is there anything I failed to ask

6   you that you wish to comment on in this case?

7          A.    I think we covered it.

8          MR. BRYAN:  May I have just a moment, your Honor?

9          THE COURT:  Well, I have one follow-up question,

10  if the Court can interject, Mr. Bryan, before you

11  conclude.

12         Before he leaves, the last subject I'd like to

13  ask him is if he can offer an opinion as to why the

14  pathological report would seem to be inconsistent with

15  the surgical report.

16         THE WITNESS:  Yes.  I think because the masses

17  weren't preoperatively studied the surgeons had a

18  difficult time working with the lesion that they found

19  and they were unable to clearly -- they were unable to

20  completely excise the lesion.  I'm not sure if they got

21  even a substantial portion of it.

22         So the tissues presented to the pathologist were

23  probably mostly just subcutaneous and so very little

24  of the tumor.  The tumor is much more serious and

25  extensive than the surgeons anticipated, since they

26  didn't study it.  So they couldn't really effectively

27  remove and the pathologist couldn't effectively examine

28  it.

1625

1    THE COURT:  Mr. Bryan.

2    BY MR. BRYAN:

3        Q.    Did they comment on the size or deepness of

4    those masses?

5        A.    Yes.

6        Q.    And how did they describe them?

7        A.    I'm referring to the operative report of

8    December 17, 1999, which was the first time.  And I'm

9    just going to read a sentence.

10       We could not get the complete varicosity because

11   it was very extensive and very deep.

12       Q.    Now, this is something they learned after

13   they began to cut?

14       A.    Oh, yes.

15       Q.    Now, is it your testimony, among other

16   things, that there should have been preoperative

17   testing that would have told them what they were after?

18       A.    In retrospect, it clearly would have been

19   wise to study it before the first surgery.  Without any

20   question, it would have been wise to study it before

21   operating on it again.

22       MR. BRYAN:  Your Honor, before I sit down, it's

23   at -- my request for an in camera is on the -- I

24   believe it's also in the supplement.  But it's on the

25   fourth page of the notice of motion, and it's between

26   lines 13 and 15.  I believe I do also repeat that

27   request in the supplement.

28       THE COURT:  Please number your pages the next

1626

```
 1   time.
 2        MR. BRYAN:  Yes, your Honor.  I just noticed
 3   that.
 4        THE COURT:  Any further questions of the witness
 5   at this time, Mr. Bryan?
 6        MR. BRYAN:  Yes, your Honor.  Just one.
 7   BY MR. BRYAN:
 8        Q.    In your opinion, is it possible that this
 9   condition or a similar condition could have existed
10   approximately three years ago?
11        A.    More than possible or probable.  I'm
12   convinced that it did.
13        Q.    And could this have an effect on mental
14   processes?
15        A.    Yes.
16        MR. BRYAN:  Nothing further.
17        THE COURT:  Mr. Barton.
18        MR. BARTON:  Thank you.
19                    CROSS-EXAMINATION
20   BY MR. BARTON:
21        Q.    Good morning, Dr. Estner.
22        A.    Good morning, Mr. Barton.
23        Q.    Okay.  Dr. Estner, for the last 10 years or
24   so, then, you haven't been practicing as a surgeon?
25        A.    Correct.
26        Q.    And primarily your practice now is what?
27        A.    Forensic psychiatry.
28        Q.    Okay.  And basically that's how you were
```



**KERN MEDICAL CENTER**

AFFILIATED WITH UNIVERSITY OF CALIFORNIA SCHOOLS
OF MEDICINE AT LOS ANGELES, SAN DIEGO, AND IRVINE

October 20, 2000

S. Miles Estner, M.D.
Forensic Medicine & Pathology
1611 5th Street #25
Sacramento  CA  95814

RE:  RAMIREZ, Juan
KMC#:  0912316

Dear Dr. Estner:

This is a re-dictation of a previous letter which I dictated
regarding a patient whom I have seen on two occasions as a
consultant.  Again, I am not the attending physician for the
patient in question, who is Juan Ramirez, a young man who is
housed in the Lerdo Pretrial Facility.  I have again seen him in
the ENT clinic on two occasions as a consultant.  I am not his
attending physician.

My examination revealed several small hemangiomas of the oral
cavity, two located on the tongue, and the other on the soft
palate.  Again, these are congenital lesions which have been
present since birth.  He apparently in the past has not been
bothered by these conditions, since in the past, he has not
sought medical evaluation or treatment for these lesions.  Again,
the hemangiomas of the tongue appear to me to be asymptomatic.
They are not imposing pressure on the airway.  I do not have the
chart with me at the present time, but I do recall there was a
small, soft hemangioma of the left side of the tongue and dorsal
surface, and a small hemangioma on the right on the ventral
surface of the tongue.  Additionally, there was a flat
discoloration of the soft palate on the right side, similarly, a
hemangioma.  He had neck lesions removed from the supraclavicular
region by the General Surgery Service, and the Pathology report
read hemangioma.  Mirror examination of his larynx and
nasopharynx revealed no extension into these areas.  Again, my
impression is that he has congenital hemangiomas, multiple
lesions, which I feel are asymptomatic.

These lesions cannot easily be removed surgically, and should not
be since there is significant danger of cranial neuropathies,
causing numbness or paralysis of the tongue.  They may be
treatable using a YAG, yttrium aluminum garnet laser, in a non-
contact mode, or these can be treated with embolization therapy
or with alcohol embolization therapy.  None of these procedures
are performed at Kern Medical Center.  The facilities are not

A-38

5 a

RE:  RAMIREZ, Juan
KMC#:  0912316

available for either use of a YAG laser or for embolization
therapy using alcohol embolization.  I previously mentioned this
in my clinic note, and was under the impression that he was being
seen at UCLA Medical Center.  I have not seen any evidence of
that to this time and, again, I have seen him on two previous
occasions.  I have no further observations to report, but, again,
my gross evaluation orally and through mirror examination reveals
these are relatively small hemangiomas.  I do not know their
exact type, but they do not appear to be causing any obstruction
at the present time.  I, personally, would not recommend surgical
removal or, in fact, attempted surgical removal, however, others
may wish to engage in the use of a YAG laser or, possibly,
embolization therapy.

Sincerely,


Richard Busch, M.D.

RB/ph


### SEE ALSO EXHIBITS D.6(a) through D.12(e)

### WHICH ARE ALL LETTERS, DOCUMENTS in re CLAIM I.

A-39
6 6

Filed AS Employee misconduct Complaint, ___ title
15 sec. 3391

## INMATE/PAROLEE APPEAL FORM
CDC 602 (12/87)

Location: Institution/Parole Region    Log No.    Category
1. _____ 50    1. 06-459    (8)
2. _____    2. _____

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|------|--------|------------|------------------|
| JUAN RAMIREZ | T-24667 | | 3-EY-08 |

**A. Describe Problem:** On 11/14/05: I was in severe pain due to the TUMORS in my neck, and because I have NOT BEEN RECEIVING THE PAIN MEDICATION THAT WAS PRESCRIBED TO ME; So I had to call MAN-DOWN and be escorted to the drop in clinic by C/o BLESSING. At the drop in clinic I was seen by Sr. M.T.A. TERRANU (Not sure of the correct spelling), In any case Mr. Terranu refused to provide me with ANY TREATMENT. I explained to him that I was in severe pain, but he STILL REFUSED to give me ANY TREATMENT. So then I asked him to please page a doctor for me, And Mr. Terranu then informed me "There was NO DOCTOR AT THE CLINIC". So then I asked if he would examine me. Mr. Terranu refused and said, "The only Doctor who can treat you is the Unit Sick

If you need more space, attach one additional sheet. **Continued on attached sheet.**

**B. Action Requested:** I want San Quentin and San Quentin's Medical Staff to STOP REFUSING MY MEDICAL NEEDS AND PAIN MEDICATION. I want to be scheduled for Sick Call EVERY-SEVEN-DAYS, to have a Doctor evaluate me and my condition, (which is defined as a medical necessity C.C.R.15 §3350 (b)1. and 4. And so my pain medication can be renewed regularly to alleviate my ongoing pain.

Inmate/Parolee Signature: _Juan Ramirez_    Date Submitted: 11-20-05

**C. INFORMAL LEVEL** (Date Received: _____)
Staff Response: You were seen in Appeal on 2-22-06 & scheduled for a followup in One month /MD.

DEC 01 REC'D

Staff Signature: _Cliff Morrow, MTA_    Date Returned to Inmate: _____

**D. FORMAL LEVEL**
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

Dissatisfied: MTA Morrow has totally ignored my Complaint. which was An Employee misconduct by MTA Terranu. Please respond to my Complaint correctly. It took staff 90 day to Answer this Appeal

Signature: _Juan Ramirez_    Date Submitted: 2-27-06
Note: Property/Funds appeals must be accompanied by a completed Board of Control form BC-1E, Inmate Claim

MAR 01 REC'D    CDC Appeal Number:

EXHIBIT C.1a

First Level    ☐ Granted    ☐ P. Granted    ☒ Denied    ☐ Other _____

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: MAR 0 1 2006    Due Date: APR 1 3 2006

Interviewed by: M Hill Culpepper, SMTA. SRMTA Therist states he does not remember this incident. However, only the doctor can determine care and treatment regarding when you would be seen in sickcall. You are reminded that pain medication is not automatically renewed. You must be evaluated by a doctor who then determines if the pain medication is medically necessary.

Staff Signature: M Hill Culpepper    Title: SR MTA    Date Completed: 04-8-06

Division Head Approved: CBarkley    Title: SR NII    APR 12 2006    Date to Inmate: 4/20/06

Signature: _____

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

Completely Dissatisfied: S.M.T.A Hill Culpepper is covering for her subordinate S.M.T.A Culpepper even says in her Response "only A Doctor can Determine Care and Treatment" If that is (See Attached    APR 28 REC'D)

Signature: Juan Ramirez    Sheet    Date Submitted: 4-24-06

Second Level    ☐ Granted    ☐ P. Granted    ☒ Denied    ☐ Other _____

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: APR 28 2006    Due Date: MAY 26 2006

☒ See Attached Letter

Signature: See Below    Date Completed: 5-30-06

Warden/Superintendent Signature: _____    Date Returned to Inmate: JUN 0 1 REC'D

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

Dissatisfied: K. Saylor, MD Health Care Manager (A) has ignored my complaint which was the staff Misconduct by SMTA Terrann. His blatan Disregard For My Health by Refusing me Medical treatment by Not Calling A Doctor to Examine Me when I was in extreme Pain.

Signature: Juan Ramirez    (Continues on next sheet)    Date Submitted: 6-9-06

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DIRECTOR'S ACTION:    ☐ Granted    ☐ P. Granted    ☒ Denied    ☐ Other _____
☒ See Attached Letter                                    Date: SEP 7 2006

CDC 602 (12/87)

NEED COPY

Attached Sheet to Administrative Appeal submitted by: Juan Ramirez (T-24667) 3-EY-08

§A. cont.

Call Doctor". I tried to explain to him that the sick call doctor has not called me for over 3-WEEKS. Mr. Terranu refused to listen to any of my complaints or concerns, And instructed C/o Blessing to escort me back to my unit, and told me to put in a sick call slip.

This is NOT THE FIRST TIME that I have been REFUSED MEDICAL TREATMENT for the Tumors in my neck, and for the pain they continuously cause me. These actions by M.T.A. Terranu, "not treating me", And San Quentin's FAILURE to have a Doctor AVAILABLE AT THE DROP IN CLINIC, where prisoners NEED EMERGENCY CARE; Clearly shows a DELIBERATE INDIFFERENCE towards my medical needs, and my life; Not to mention every other prisoner at San Quentin. San Quentin's Warden and Medical Staff are violating my Eighth Amendment rights by causing me to live with the pain and suffering of my tumors, And not providing me with the medical treatment/medication necessary to alleviate my pain and suffering.

Signed: _Juan Ramirez_    Dated: _11-20-05_

C/o Blessing

B.2                    EXHIBIT C.1b

Continued From sec."F" Appeals Form.
The Case then why twas I refused the
right to be examined by a Dotur. When
I went to the Drop In Clinic As A "MAN
Down", out of East Block.

Also when I was interviewed by SMTA
Culpepper For this 602 I asked her to
please Interview c/o Blessing who was
the escorting officer who took me to
the Drop In Clinic that DAY. He was
my witness that MTA Theriot refused
me medical treatment. But as you
CAN see S.MTA Culpepper refused to
Interview c/o Blessing. This Act leads
me to believe that S.MTA Culpepper
is Covering For MTA Theriot Employee
misconduct.

Form After Requesting staff to Attach
AN Employee Misconduct Form through out
this Appeal staff Failed to Do So. So I took
it upon myself to Attach this Employee
Misconduct Form Against SR MTA Theriot

Juan Ramirez
#T24667
9-24-06.

EXHIBIT C.1c

B3

Continued From sec. H Appeals Forms.
K. Saylor. MD Health Care Manager
has included copies of the lists of
Medications I take. Which is proof
that I am sick with a serious
problem. This proves that the
Day I was refused the Medical
treatment by SMTA Terranu
I was in serious pain And needed
to see A Doctor Which SMTA
Terranu Refused to Call him.

6-7-06

_Juan Ramirez_
# T34267
3-EY-8

Also K. Saylor HCM has refused
to sign the Staff Misconduct
form Attached to this 602.

EXHIBIT C. 1d

State of California                                    Department of Corrections and Rehabilitation

# Memorandum

Date    :    **5/25/06**

To      :    **RAMIREZ**
             **CDC # T24667**

From    :    California State Prison, San Quentin CA 94964

Subject :    **SECOND LEVEL APPEAL RESPONSE**
             **LOG NO. CSQ 6-06-00459**
             **APPEAL ISSUE:  MEDICAL**

**ISSUE:**
You claim that you need to have medication delivered for your pain.

**INTERVIEWED BY:** SrMTA Hill-Culpepper interviewed you on 4/8/06.  She informed you that your needs were being met.  You were also informed that medications were not automatically renewed and a doctor would evaluate the medical necessity of the medication.  At that time your first level appeal was DENIED.

**REGULATIONS:** The rules governing this issue are:
**Title 15 California Code of Regulations (CCR) §3350. Provision of Medical Care and Definitions.**

(a)    The department shall only provide medical services for inmates, which are based on medical necessity and supported by outcome data as effective medical care. In the absence of available outcome data for a specific case, treatment will be based on the judgment of the physician that the treatment is considered effective for the purpose intended and is supported by diagnostic information and consultations with appropriate specialists.  Treatments for conditions, which might otherwise be excluded, may be allowed pursuant to section 3350.1(d).

(b)    For the purposes of this article, the following definitions apply:

(1)    Medically Necessary means health care services that are determined by the attending physician to be reasonable and necessary to protect life, prevent significant illness or disability, or alleviate severe pain, and are supported by health outcome data as being effective medical care.

(2)    Outcome Study means the definition, collection and analysis of comparable data, based on variations in treatment, concerning patient health assessment for purposes of improving outcomes and identifying cost-effective alternatives.

(3)    Outcome Data mean statistics such as diagnoses, procedures, discharge status, length of hospital stay, morbidity and mortality of patients that are collected and evaluated using science-based methodologies and expert clinical judgment for purposes of outcome studies.

(4)    Severe pain means a degree of discomfort that significantly disables the patient from reasonable independent function.

**DECISION:**

EXHIBIT C.1e

MEMORANDUM,
FROM: K. Saylor, Health Care Manager (A)
SUBJECT: Second Level Appeal Response, Log No. CSQ-4-06-00261
TO: RAMIREZ T-24667
Page 2 of 2 Pages

A medical chart review was conducted on 5/25/06. You have been receiving your medications as ordered. There was noted in February a brief interruption of your medication delivery. All Medication Administration Records (MARS) have been reviewed and there were no other interruptions after that point. Copies of your MARS have been attached for your review.

**There were no effective communications issues observed or documented in the unit health record on 5/25/06.**

DECISION: The appeal is DENIED.
Based upon the totality of information, it is determined San Quentin's medical department is in full compliance with **Title 15 California Code of Regulations (CCR) §3350. Provision of Medical Care.** The appeal process cannot dictate medical care and treatment plans as it is not within the purview of the appeal process and this fact is not negotiable. You are also reminded that the appeal process cannot dictate staff discipline measures. Furthermore, The appeal process cannot dictate changing medical policies and procedures. Therefore your CDC 602 Appeal is DENIED at the SECOND LEVEL.

The appellant is advised that this issue may be submitted for a Director's Level of Review if desired.

**K. Saylor, M.D.**
**Health Care Manager (A)**

EXHIBIT C.1 F

CDC 1617 (3/89) ofm                                                                 8202

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
INMATE APPEALS BRANCH
P. O. BOX 942883
SACRAMENTO, CA  94283-0001

# DIRECTOR'S LEVEL APPEAL DECISION

Date:  **SEP 7  2006**

In re:  Ramirez, T-24667
California State Prison, San Quentin
San Quentin, CA  94964

IAB Case No.: 0514937          Local Log No.: SQ  06-459

This matter was reviewed on behalf of the Director of the California Department of Corrections and Rehabilitation (CDCR) by Appeals Examiner C. Hall, Facility Captain. All submitted documentation and supporting arguments of the parties have been considered.

**I    APPELLANT'S ARGUMENT:** It is the appellant's position on November 14, 2005, he experienced severe pain due to tumors in his neck. According to the appellant, due to not receiving pain medication a "man-down" call was initiated and he was subsequently escorted to the clinic by Correctional Officer Blessing. The appellant alleges once in the clinic his initial contact was with Medical Technical Assistant (MTA) Terrano (sic) who the appellant claims refused to treat him. When the appellant requested to be treated by a physician, he alleged the response given by the MTA was "there is no doctor in the clinic." When the appellant requested treatment from MTA Terrano once again, he claimed he was informed only a physician could treat him and instructed him to submit a CDC Form 7362, Health Care Services Request. The appellant is requesting California State Prison, San Quentin (SQ) health care staff cease the practice of refusing to provide health care intervention and administer prescribed his pain medication. In addition, he is demanding to be evaluated every seven days; and, to have his pain medication renewed on a regular basis.

**II    SECOND LEVEL'S DECISION:** It is the institution's position the appellant's health care needs are being met. Pain medications are not routinely renewed until the appellant's health care status is reviewed by his primary care physician (PCP) and determined to be medically indicated. A review of the appellant's Unit Health Record was conducted on May 25, 2006, where it was determined the appellant was receiving his medications as prescribed; however, there was a brief interruption in February 2006. Health care staff reviewed the appellant's Medication Administration Record and determined no other interruptions occurred.

**III    DIRECTOR'S LEVEL DECISION:** Appeal is denied.

    **A.  FINDINGS:** Although the appellant believes MTA Terrano refused to treat him, it is beyond his scope of license to assess and/or treat a patient. The newly implemented Inmate Medical Services Program was implemented in 2003 and defines health care staff's roles. Only a registered nurse can triage a patient and then determine if his condition is routine, urgent or emergent. After the level-of-care is determined, the appropriate intervention will be provided. By the appellant demanding MTA Terrano provide immediate assessment and treatment, he is subjecting him to violate the regulations of his professional license. The MTA was performing his duties as mandated by the Board of Psychiatric Technicians and Licensed Vocational Nurses; therefore, the allegations of his misconduct are refuted. The health care of the inmate population is the Division of Correctional Health Care Services goal. It is in the appellant's best interest for his PCP to review his health status prior to renewing medications. The unfortunate delay of the appellant's pain medication administration in February 2006 has been corrected, and according to health care staff he is receiving his medications as prescribed. It is inappropriate for the appellant to dictate his own health care. The health care staff are professionally trained and will recommend the treatment they determine is medically necessary and appropriate for the appellant. After review, there is no compelling evidence that warrants intervention the Director's Level of Review.

    **B.  BASIS FOR THE DECISION:**
California Code of Regulations, Title 15, Section: 3350, 3354

    **C.  ORDER:** No changes or modifications are required by the institution.

⚡ 6.7                                    EXHIBIT C·1    9

RAMIREZ, T-24667
CASE NO. 0514937
PAGE 2

This decision exhausts the administrative remedy available to the appellant within CDCR.

N. GRANNIS, Chief
Inmate Appeals Branch

cc:    Warden, SQ
       Health Care Manager, SQ
       Appeals Coordinator, SQ
       Medical Appeals Analyst, SQ

a8

EXHIBIT C.1 h

State of California                                    Department of Corrections

# ALLEGATION OF MISCONDUCT BY PEACE OFFICER
## NOTICE OF RIGHTS AND RESPONSIBILITIES

Pursuant with Penal Code Section 148.6, anyone wishing to file an allegation of misconduct by a departmental peace officer must read, sign and submit the following statement.

Please read and sign acknowledging the following and return to appropriate Department staff as indicated above:

YOU HAVE THE RIGHT TO MAKE A COMPLAINT AGAINST A DEPARTMENTAL PEACE OFFICER FOR ANY IMPROPER PEACE OFFICER CONDUCT. CALIFORNIA LAW REQUIRES THIS AGENCY TO HAVE A PROCEDURE TO INVESTIGATE COMPLAINTS. YOU HAVE A RIGHT TO A WRITTEN DESCRIPTION OF THIS PROCEDURE. THIS AGENCY MAY FIND AFTER INVESTIGATION THAT THERE IS NOT ENOUGH EVIDENCE TO WARRANT ACTION ON YOUR COMPLAINT; EVEN IF THAT IS THE CASE, YOU HAVE THE RIGHT TO MAKE THE COMPLAINT AND HAVE IT INVESTIGATED IF YOU BELIEVE AN OFFICER BEHAVED IMPROPERLY. COMPLAINTS AND ANY REPORTS OF FINDINGS RELATING TO COMPLAINTS MUST BE RETAINED BY THIS AGENCY FOR AT LEAST FIVE YEARS.

IT IS AGAINST THE LAW TO MAKE A COMPLAINT THAT YOU KNOW IS FALSE. IF YOU MAKE A COMPLAINT AGAINST AN OFFICER KNOWING THAT IT IS FALSE, YOU CAN BE PROSECUTED ON A MISDEMEANOR CHARGE IN A CRIMINAL COURT.

_____                    4-24-06
Complainant's Signature #T24607                    _____
                                                   Date signed

_____                    _____
Receiving Staff's Signature                        Date signed

EXHIBIT C.1:

B9

STATE OF CALIFORNIA

## PENAL CODE SECTION 148.6 COMPLAINT

1. NAME OF AGENCY COMPLAINED ABOUT: San Quentin Medical Staff.

2. NAME AND TITLE OF PERSON/PEACE OFFICER INVOLVED: SR.M.T.A Theriot

3. DATE OR DATES OF INCIDENTS: 11-14-05

4. STATEMENT OF FACTS DESCRIBING ALLEGED WRONGDOING:

On 11-14-05 Appealant was sick and went "Man Down" And was escorted to the Drop In Clinic By C/O Blessing. Where SR MTA Theriot refused to call a Doctor in order to Examine me. I asked SR MTA Theriot "Are you saying you refuse to call a Doctor to examine me." SR MTA Theriot says "Yes" Denying me medical treatment is clearly Against the rules and regulations Also violating my 8th Amendment rights.

5. NAME, ADDRESS AND PHONE # OF PERSON MAKING THIS COMPLAINT:

(NAME) Juan Ramirez          (DAY PHONE)

(ADDRESS) #T24667 3EY-8 S.Q.S.P     (CITY) San Quentin

6. EXTENT OF INJURIES/AMOUNT OF MONEY DAMAGES CLAIMED/SPECIFIC

RIGHTS VIOLATED: 8th Amendment Also CCR Title 15 reiles and Regulations Sec. 3350 (a) (4)(5) And my Rights under the "Plata" agreement.

Appeals Coordinator                                          4.9.07
C. Dacanay

       I am having a problem in
getting my "second level" 602
response for the following 3-     Due Date
Appeals = Log # CSQ-6-██████ : 3.14.0
      Log # CSQ-6-██████ : 3.14.0
      Log # CSQ-6-██████ : 3.16.0
All 3 are medical Appeals. The
"Inmate Appeal Assignment Notice"
Says they all went to the HCM
I've written to the HCM on
2 seperate occasions. Informing
them that "the Response time
limitation have already past. To
Please Respond to my 602."
      But no one is responding
to my kites. Can you please
instruct the HCM to please
answer and Return my Appeal as
soon as possible. These Appeals
are very Important for my health.

      Thankyou for your Assistance

4/11

Staff has been notified about          Respectfully;
your overdue appeal.

                    Juan Ramirez
      K Marshall          T24667     APR 19 REC'D
                      4·59·22

EXHIBIT - C. 2

**INMATE/PAROLEE
APPEAL FORM**
CDC 602 (12/87)

Location: Institution/Parole Region    Log No.    Category

1. _SQ_    1. _07-01896_    _10_

2. _____    2. _____

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

NAME _JUAN RAMIREZ_    NUMBER _T34467_    ASSIGNMENT _____    UNIT/ROOM NUMBER _4-E-9-22_

A. Describe Problem: _I'm submitting this Appeal because San Quentin's Medical Employees Are denying my DIRECT ACCESS TO TH Courts by REFUsing to Process my Administrative Appeals (see Appeal Assignment Notices #1 #3) — The P.L.R makes it Clear that Prisoners must EXHAUST ALL ADMINISTRATIVE REMEDIES THAT ARE "AVAILABLE TO THEM" Before Proceeding to The Courts to Seek Remedies. (see attached Sheet)_

If you need more space, attach one additional sheet.

B. Action Requested: _Appellant Request that these 602's be Processed AND Returned to me. So Appellant can Exhaust his administrative remedies. OR in the Alternative make A Finding the 602's Are FULLY EXHAUSTED "within the Department of_

Inmate/Parolee Signature: _Juan Ramirez_    MAY 03 REC'D    Date Submitted: _4-30-07_

C. INFORMAL LEVEL (Date Received: _____ )

Staff Response: _____

**Bypass**

Staff Signature: _____    Date Returned to Inmate: _____

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

**Bypass**

Signature: _____    Date Submitted: _____

Note: Property/Funds appeals must be accompanied by a completed    CDC Appeal Number: _____
Board of Control form BC-1E, Inmate Claim

_EXHIBITS C.3 a_

MAY 04 REC'D

MAY 0 4 RECD

First Level    ☐ Granted    ☒ P. Granted    ☐ Denied    ☐ Other _____

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: **MAY 0 3 2007**    Due Date: **JUN 1 8 2007**

Interviewed by: D. Hansen RN. I reviewed your appeal and met with you on 6-19-07 at your housing unit 4EY 22 To let you know that your appeal Assignment notices #1 - #3 r being processed.

Staff Signature: B Hansen RN 6/19/07    Title: RN    Date Completed: _____

Division Head Approved: Check    Title: Senior 6/20/07    Returned RECD JUN 20 Date/Inmate: _____
Signature:

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

Dissatisfied: For the Fact that CMO saylor is purposely holding my 602s and refusing to Answer them. It has now Been 5 months since my 602 have been with the CMO saylor. I have now started the Litigation process against CMO saylor for denying me my right to file 602s

Signature: Juan Ramirez    Date Submitted: 7-7-07

Second Level    ☐ Granted    ☐ P. Granted    ☐ Denied    ☐ Other _____

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: _____    Due Date: _____
☐ See Attached Letter

Signature: _____    Date Completed: _____

Warden/Superintendent Signature: _____    Date Returned to Inmate: _____

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

Signature: _____    Date Submitted: _____

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION:    ☐ Granted    ☐ P. Granted    ☐ Denied    ☐ Other _____
☐ See Attached Letter

Date: _____

CDC 602 (12/87)

Continued From Sec. (A) Appeals Form

San Quentins Medical STAFFS Refusal to process Appellants Claim is CLEARLY intended to Prevent Appellant From seeking/obtaining Relief From the Courts

Action Requested

Corrections, So Appellant can proceed to the Courts.

MAY 04 REC'D

EXHIBIT C. 3b

Pharmitr
# 3

## INMATE APPEAL ASSIGNMENT NOTICE

To: INMATE RAMIREZ, T24667                    Date: February 21, 2007
Current Housing: 4EY22

From: INMATE APPEALS OFFICE

Re: APPEAL LOG NUMBER: CSQ-6-06-03911

ASSIGNED STAFF REVIEWER: HCM        — SEE EXHIBITS C.4a - 4d
APPEAL ISSUE: MEDICAL
DUE DATE: 03/14/2007

Inmate RAMIREZ, this acts as a notice to you that your appeal has been sent to the above
staff for SECOND level response. If you have any questions, contact the above staff
member. If dissatisfied, you have 15 days from the receipt of the response to forward
your appeal for THIRD level review. Third level appeals are to be mailed directly to:

          Chief of Inmate Appeals
          Department of Corrections
          P. O. Box 942883
          Sacramento, CA 94283-0001

R.Chandler-Dacanay or W.Jeppeson
Appeals Coordinator
San Quentin State Prison

          MAY 0 4 REC'D

EXHIBITS C.3 c



# INMATE APPEAL ASSIGNMENT NOTICE

To: INMATE RAMIREZ, T24667                    Date: February 21, 2007
Current Housing: 4EY22

From: INMATE APPEALS OFFICE

Re: APPEAL LOG NUMBER: CSQ-6-06-03717

ASSIGNED STAFF REVIEWER: HCM                *SEE EXHIBITS C.5 - C.5d*
APPEAL ISSUE: MEDICAL
DUE DATE: 03/14/2007

Inmate RAMIREZ, this acts as a notice to you that your appeal has been sent to the above
staff for SECOND level response. If you have any questions, contact the above staff
member. If dissatisfied, you have 15 days from the receipt of the response to forward
your appeal for THIRD level review. Third level appeals are to be mailed directly to:

> Chief of Inmate Appeals
> Department of Corrections
> P. O. Box 942883
> Sacramento, CA  94283-0001

R.Chandler-Dacanay or W.Jeppeson
Appeals Coordinator
San Quentin State Prison

**MAY 0 4 REC'D**

*EXHIBIT C. 3 d*

# 1

## INMATE APPEAL ASSIGNMENT NOTICE

To: INMATE RAMIREZ, T24667
Current Housing: 4EY22                                    Date: February 21, 2007

From: INMATE APPEALS OFFICE

Re: APPEAL LOG NUMBER: CSQ-6-07-00040                SEE EXHIBITS C.6.- C.6e

ASSIGNED STAFF REVIEWER: HCM
APPEAL ISSUE: MEDICAL
DUE DATE: 03/16/2007

Inmate RAMIREZ, this acts as a notice to you that your appeal has been sent to the above staff for SECOND level response. If you have any questions, contact the above staff member. If dissatisfied, you have 15 days from the receipt of the response to forward your appeal for THIRD level review. Third level appeals are to be mailed directly to:

    Chief of Inmate Appeals
    Department of Corrections
    P. O. Box 942883
    Sacramento, CA  94283-0001

R.Chandler-Dacanay or W.Jeppeson
Appeals Coordinator
San Quentin State Prison

wrote Appeals Coordinator on
4.9.07 About timeLimitation violation
on All 3. Appeals.

**MAY 04 REC'D**

EXHIBIT - C.3e

*Emergency 602* *Employee Misconduct*

**INMATE/PAROLEE APPEAL FORM**
CDC 602 (12/87)

Location: Institution/Parole Region
1. SQ     Log No. 06-3911     Category 8
2.

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

NAME Juan Ramirez    NUMBER T34667    ASSIGNMENT    UNIT/ROOM NUMBER 4-EY22

A. Describe Problem: The Pharmacy nurse "Rosa" is Refusing to issue my prescribed medication "Imitrex 50mg." On 12.8.06 Dr. Daszko prescribed to me Imitrex taking 2 pill each time I get a severe migraine. On 12.12.06 I was issued only 9 pills supply which is only 4½ days worth. I ran out already. East Block Nurse Sabrina tried to get m a Refill but Pharmacist Rosa said those 9 pill (see Attached Sheet)

If you need more space, attach one additional sheet.

B. Action Requested: That I be given the right amount of medicat. Right Away. #2 This Appeal be filed as an "Employee Misconduc Complaint" and placed in Pharmacist Rosa Work File #3 Pharmacist Rosa stop causing me pain & suffering.

Inmate/Parolee Signature: Juan Ramirez    DEC 21 RECD    Date Submitted: 12-20-06
DEC 20 RECD

C. INFORMAL LEVEL (Date Received)

Staff Response:

Bypass

Staff Signature:    Date Returned to Inmate:

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

Bypass

Signature:    Date Submitted:
Note: Property/Funds appeals must be accompanied by a completed    CDC Appeal Number:
Board of Control form BC-1E, Inmate Claim

EXHIBIT C.4a    DEC 26 RECD

First Level    ☐ Granted    ☒ P. Granted    ☐ Denied    ☐ Other

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: **DEC 21 2006**    Due Date: **FEB 06 2007**

Interviewed by: K Harrell RN

You were given the correct number of pills allowed per month for that medication. It is not a drug intended to be taken daily, only when you have an actual migraine. Per inmate appeals ofc, if you wish to make a staff complaint, please address on a seperate 602.

Staff Signature: Karen Stancler    Title: RN    Date Completed: 1/31/07
Division Head Approved?    Returned
Signature: S George RN    Title: SRN III (A)    Date to Inmate: 1/31/7

FEB 0 2 RECD

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

Dissatisfied; First off the Pharmacist is not A Doctor A can not say when I need the medication. Which she with held. Even though it was prescribed by the Doctor. Which is wrong on the Pharmacist side. (see attached sheet.

Signature: Juan Ramirez    Date Submitted: 2-3-07

Second Level    ☐ Granted    ☐ P. Granted    ☐ Denied    ☐ Other

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: _____    Due Date: _____
☐ See Attached Letter

Signature: _____    Date Completed: _____

Warden/Superintendent Signature: _____    Date Returned to Inmate: _____

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

_____
_____
_____
_____
_____
_____

Signature: _____    Date Submitted: _____

For the Director's Review, submit all documents to:    Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION: ☐ Granted    ☐ P. Granted    ☐ Denied    ☐ Other _____
☐ See Attached Letter
Date: _____

CDC 602 (12/87)

Continued From Sec "A" Appeals Form
were supposed to Last **30 days**. That is
when I get Another issue.

Pharmacist Rosa is in violation of the
Rule And regulations Also my Civil Rights
by causing me Undo Pain And Suffering.
Pharmacist Rosa is Also not Qualified
to Deny me my Medication because
she is not my Doctor nor Did she Examin
me. She is refusing to Follow the Dr
Daszko orders As he being my Doctor.
who prescribed this medication To Me.

For the Record this medication
Works great And gets rid of my Severe
Migraines. I need this Medication.
This Nurse is just purposely causeing
me severe Pain And Suffering by
Dening me My Medication. which
Dr. Daszko prescribed to me on 12·11·06.

12·20·06
Respectfully,

Juan Ramirez
#T24667
4·EY·22

EXHIBIT C.46

Continued From Sec "E" Appeals Form.
Pharmacists Rosa was supposed to
inform the Doctor of this situation. of
the Amount of Medication She can give me.
Instead she ignored my pleas And
forced me to suffer under PAIN. This
was Done Maliciously by Pharmasist Rosa.
    Secaund. This Appeal is AN
Employee misconduct. I can NOT
File another because The Appeals
Coordinator would consider it
A Duplicate 602.

               Thank you              2-8-07


                    Juan Ramire
                    # T24667
                    4-EY-22


          EXHIBIT C.4 c

Appeals
Coordinator

I was told to ask you to please Attach AN "Employee Misconduct" Form to my Appeal Thank you.

If not Possible Please Direct Me as to where I CAN acquire one of these forms.

_[signature]_
T24667
4-EY-22

EXHIBIT C.4 d

**INMATE/PAROLEE**
**APPEAL FORM**
CDC 602 (12/87)

| | Location: | Institution/Parole Region | Log No. | | Category | |
|---|---|---|---|---|---|---|
| | 1. | 5Q | 1. 06-3717 | | | |
| | 2. | | 2. | | | |

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

NAME Ramirez, Juan   NUMBER 124667   ASSIGNMENT   UNIT/ROOM NUMBER 4EV22

A. Describe Problem:

*See attached Exhibit A*

If you need more space, attach one additional sheet.

B. Action Requested: That my issue of Neurontin ethier be given to me in 2week supply as before. or I start getting Medication Around 3 pm After Noon.

Inmate/Parolee Signature: _Juan Ramirez_   Date Submitted: 10-29-06

C. INFORMAL LEVEL (Date Received: Nov 1, 2006 *denied*

Staff Response: All neurontin is being delivered D.O.T. or direct observation therapy, per the CMO. You have a pending MD appt. (appointment) next week. Please discuss this with Dr. Ward at that time.

Staff Signature: _Karen Van Leuven_ 11/14/06   Date Returned to Inmate: NOV 15 2006

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

Dissatisfied: I continue to have serious problems with my neurontin For the simple Fact that now that it's D.O.T Atleast 2 or 3 times a week they Dont give them to me. For instance on the

Signature: _Juan Ramirez_   Date Submitted: 12.4.06
Note: Property/Funds appeals must be accompanied by a complete   CDC Appeal Number:
Board of Control form BC-1E, Inmate Claim

JAN 30 2007

DEC 07 REC'D

EXHIBIT C.5a

First Level   ☐ Granted   ☐ P. Granted   ☑ Denied   ☐ DEC 0 7 2006          JAN 2 3 2007

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: _____   Due Date: _____

Interviewed by: SrVATA MANSA. on 30 Jan 07 at @ 0N 22. I/M Ramirez (T24667)
stated his needs to have his Newrontin prescription be delivered to him. He
has spoken to RN Harrell (bridge Nurse) and was given the response
that only the CMO can approve his request. I reiterated the same
explanation that his Newrontin was within sees a DOT medication
and will remain that way until the M.D. Dr. EB has renewed his
medication delivery order to the CMO's approval. _____

Staff Signature: _____   Title: SrVATA   Date Completed: 30 Jan 07

Division Head Approved: JMorse SrVII(A)   Title: SrVII   FEB 0   Date Returned to Inmate: 1/31/7

Signature: _____

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

Dissatisfied: Because I can Not Read what the First
level Response is. Also I continue to Not be given
My Newrontins on 2-1-07 pm Also 2-2-07 pm
I was only given ½ my Newrontins.

Signature: Juan Ramirez   Date Submitted: 2-_-07

Second Level   ☐ Granted   ☐ P. Granted   ☐ Denied   ☐ Other _____

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: _____   Due Date: _____
☐ See Attached Letter

Signature: _____   Date Completed: _____

Warden/Superintendent Signature: _____   Date Returned to Inmate: _____

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

_____
_____
_____
_____
_____
_____

Signature: _____   Date Submitted: _____

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION:   ☐ Granted   ☐ P. Granted   ☐ Denied   ☐ Other _____
☐ See Attached Letter
                                                            Date: _____

CDC 602 (12/87)

EXHIBIT A

NOV 01 REC'D    JAN 30 2007

Dr. Lopez                                              10.29.06

My name is Juan Ramirez # T31407.
You've treated me on several occasions
for severe pain from the tumors in my
Neck & Tongue. I saw you last on 6.22.06
Where you renewed my pain medications
for 6 months. Tylenol #4 and 900 mgs of
Neurontins both twice a day.

You prescribed my "neurontins" to be
given in Bowlk in 2 week supplies Because
I needed medication in the early afternoon
2 or 3 pm But meds are only passed out twice
a Day. You tried to get them delivered to
me 3 times a Day, But they told you, No!!

So you Decided to prescribe the "Neurontin"
in Bowlk so I have medication in my cell
see to it Being 12 to 15 hours in Between Med-
ication Delivery.

The problem is on 10.24.06 They stopped
Bringing my "Neurontins" in Bowlk By your Order
There are Days They don't Bring me my "Neuront..."
I have started to have severe pain in the
afternoons Because of lack of Pain Medication
Can You Please re-instate my "Neurontins"
in Bowlk? Because Im taking "Divesater"

which is starting to make my sides hurt
? but it is not working. I was doing
xray before they stopped my Back "Neurontin
Can you either come examine me?
Or reinstate my Medication? I was told
by the nurse your the only only one who
can re do it.

FEB 02 2007                                    JAN 30 2007

Respectfully

Juan Ramirez
JUAN RAMIREZ
# T-34667
4.Eg. 22

EXHIBIT C.5.c

Continued From **Sec. D.** Appeal Form.
most recent Days the Nevrontin were
Not given to me. ON 12.2.06 - Am
meds. Also 12.3.06 Am meds. The MTA
SAys "I don't get them because they
were not in my pill envelope. Which is
wrong and plain Laziness on the MTAs
Part.

Also because it's about 13 to hours
between my medication issues. I used
to take my night time dose of Nevrontin
Around 3 pm when I really need
some pain medication. Now I'm being
Forced to take Ibuprofen everyday
which is starting to give me sharp
pains in the Kidney Area. Which
As the Days go on is getting to be
more Painful.

**FEB 02 2007**

Action Requested.     **JAN 30 2007**

See Sec. B Appeals Form.

12.4.06
Respectfully.

Juan Ramirez
#T24667
4.E9.22

EXHIBIT C.5d

07-00040

**INMATE/PAROLEE APPEAL FORM**
CDC 602 (12/87)

Copy

Location: Institution/Parole Region: SQ
Log No. 1. 07-00040
2. _____
Category 2. _____

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME JUAN RAMIREZ | NUMBER T24667 | ASSIGNMENT | UNIT/ROOM NUMBER 4E5-22 |

A. Describe Problem: The problem in Question is Being Allergic to Peanuts and Peanut Products. And I'm Requesting to be provided A supplemental Diet As is Required by my Chronic Condition and CCR title 15 Rules and Regulations. This should be noted on my medical File. As I've notified Staff on 2 seprate occasions Now. I recently suffered AN Allergic Reaction to peanuts AFter (see Attached Sheet)

If you need more space, attach one additional sheet.

B. Action Requested: I would like to be provided AN Equal Nutritional VALUE meal in Place of the meals which contain Peanut Butter or Peanut Products. OR Supplements for the Nutritional VALUE I am being Forced to go without.

Inmate/Parolee Signature: Juan Ramirez     Date Submitted: 12/3/06

DEC 14 Rec'd denied

C. INFORMAL LEVEL (Date Received: _____)

Staff Response: per Our dietician No Substitutes. It is up to you to choose foods you can eat off your tray. There are no special food plans for Inmates allergic to peanut products.

Staff Signature: K Evans RD  12-27-6     Date Returned to Inmate: DEC 28 2006

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

Dissatisfied: Due there Are special Diets given to Inmates (see Attached Exhibit A) Also K Evans has no right to say I must choose what I eat off the tray. I'm by law required to be given a set Number of calories meals. By Not eating All these Peanut Products I'm Not receiving my Full Daily Calories

Signature: Juan Ramirez     Date Submitted: 1.2.06

Note: Property/Funds appeals must be accompanied by a completed Board of Control form BC-1E, Inmate Claim

CDC Appeal Number:

JAN 08 2007
JAN 0 4 REC'D

EXHIBIT C.6a

First Level    ☐ Granted    ☐ P. Granted    ☒ Denied    ☐ Other    **JAN 0 4 2007**

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: _____ Due Date: **FEB 2 0 2007**

Interviewed by: *KEVANS RN 2-1-07*

*as per our conversation you are going to submit @ 7362 for a appt with your pcp (primary care physician) who will evaluate you & if he feels necessary submit a consult for dietary.*

Staff Signature: *Kevans rn*    Title: *RN*    Date Completed: *2-1-7*

Division Head Approved:    *Church*

Signature: _____    Title: *WN* FEB 05    Returned RECD: *2/2/07* Date to Inmate:

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

*Dissatisfied: I've seen the Doctor once who instructe me to write the Medical Dept. Now Evans is telling me to go to sick call. This is gust sending me in circles in order not to treat this situation*

Signature: *Juan Aguirre*    FEB 15 RECD    Date Submitted: *2.12.07*

Second Level    ☐ Granted    ☐ P. Granted    ☒ Denied    ☐ Other    **FEB 15 2007**    **MAR 16 2007**

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: _____ Due Date: _____

☐ See Attached Letter

Signature: _____    Date Completed: _____

Warden/Superintendent Signature: _____    Date Returned to Inmate: _____

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

_____

_____

_____

_____

_____

_____

_____

Signature: _____    Date Submitted: _____

For the Director's Review, submit all documents to:    Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION:    ☐ Granted    ☐ P. Granted    ☐ Denied    ☐ Other _____

☐ See Attached Letter

Date: _____

CDC 602 (12/87)

