IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN VILLA RAMIREZ,<br><br>    Plaintiff,<br><br>  v.<br><br>JAMES TILTON, et al.,<br><br>    Defendants.<br>                                          / | No. C 07-04681 SBA (PR)<br><br>**ORDER GRANTING DEFENDANT BELAVICH'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING CLAIMS AGAINST DEFENDANT CALVO**<br><br>(Docket no. 49) |

     Plaintiff Juan Villa Ramirez, a state prisoner currently incarcerated at San Quentin State Prison (SQSP), filed this civil rights action under 42 U.S.C. § 1983 against twenty-one Defendants, all officials and employees at SQSP and the California Department of Corrections and Rehabilitation (CDCR), alleging: (1) indifference to his hemangiomas (i.e., tumor-like blood vessel accumulations); (2) refusal to process his grievances; and (3) refusal to accommodate his peanut allergies. (Compl. at 1.)

     On March 8, 2010, the Court reviewed the complaint. As to claim one, the Court concluded, "Liberally construed, Plaintiff's allegations that the SQSP medical staff failed to provide adequate medical treatment for his hemangiomas state a cognizable deliberate indifference claim against Defendants Dr. Sayer, Dr. Poluzza, Dr. Kholsla, Dr. Belavich, Dr. Calvo, [Medical Technical Assistant (MTA)] Hill-Culpepper, MTA Guildersleeves, MTA Morrow and MTA Terranu." (Mar. 8, 2010 Order at 1.) Plaintiff's second claim, concerning the handling of his appeals, was dismissed. As to his third claim, the Court dismissed his claims against individual Defendants under Title II of the Americans with Disabilities Act of 1990 (ADA) and § 504 of the Rehabilitation Act of 1973; however, it directed Plaintiff to amend his ADA and Section 504 claims against Defendants SQSP and CDCR. The Court gave Plaintiff until April 5, 2010 to file an amendment to the complaint. He was warned the failure to do so would result in dismissal of his ADA and Section 504 claims without prejudice.

     On April 15, 2010, the Court granted Plaintiff an extension of time to file an amendment to the complaint. Therefore, Plaintiff had until May 10, 2010 to file an amendment to the complaint.

1  Plaintiff was again warned that the failure to do so would result in dismissal of his ADA and Section
2  504 claims without prejudice.
3      In an Order dated May 10, 2010, the Court noted that the time to file the amendment to the
4  complaint had passed, and Plaintiff had failed to do so.  Therefore, the ADA and Section 504 claims
5  against Defendants SQSP and the CDCR were dismissed without prejudice.
6      In an Order dated May 24, 2010, the Court gave Plaintiff notice of its inability to effectuate
7  service on Defendants Sayer, Poluzza, Kholsla, Hill-Culpepper, Guildersleeves, Morrow and
8  Terranu.  The Court ordered Plaintiff to provide the current addresses of these Defendants within
9  thirty days of the notice.  The Court warned Plaintiff that his failure to provide the current addresses
10 of Defendants Sayer, Poluzza, Kholsla, Hill-Culpepper, Guildersleeves, Morrow and Terranu within
11 the thirty-day deadline would result in the dismissal of all claims against these Defendants without
12 prejudice under Rule 4(m) of the Federal Rules of Civil Procedure.
13     In an Order dated June 30, 2010, the Court noted that the time to provide the Court with the
14 aforementioned Defendants' current addresses had passed, and Plaintiff had failed to do so.
15 Therefore, all claims against Defendants Sayer, Poluzza, Kholsla, Hill-Culpepper, Guildersleeves,
16 Morrow and Terranu were dismissed without prejudice under Rule 4(m).  After dismissing the
17 aforementioned Defendants, the Court indicated that the only remaining defendant was Defendant
18 Belavich.  (June 30, 2010 Order at 3.)  However, since issuing that Order, the Court has determined
19 that Defendant Calvo, who also had not been served, is another remaining defendant in this action.
20     On September 10, 2010, the Court gave Plaintiff notice of its inability to effectuate service
21 on Defendant Calvo.  The Court ordered Plaintiff to provide the current address of Defendant Calvo
22 within fifteen days of the notice.  The Court warned Plaintiff that the failure to provide the current
23 address of Defendant Calvo within the fifteen-day deadline would result in the dismissal of all
24 claims against Defendant Calvo without prejudice under Rule 4(m).  As of today's date, the time to
25 provide the Court with Defendant Calvo's current address has passed, and Plaintiff has failed to do
26 so.  Accordingly, all claims against Defendant Calvo are dismissed without prejudice.
27     Defendant Belavich is now the only remaining defendant in this case.
28     Before the Court is Defendant Belavich's motion for summary judgment.

Plaintiff has not filed an opposition to Defendant Belavich's motion for summary judgment.[1] However, Plaintiff's verified complaint functions as an affidavit in support of his claims and may be considered as evidence in evaluating the merits of Defendant Belavich's motion for summary judgment. See Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995); see also Rodriguez v. Airborne Express, 265 F.3d 890, 902 (9th Cir. 2001) (an affidavit is "cognizable to establish a genuine issue of material fact so long as [it] state[s] facts based on personal knowledge and is not too conclusory").

## DISCUSSION

### I. Factual Background

Plaintiff suffers from hemangiomas, which is a "disease/condition that causes tumors to develop in his body." (Compl. at 4.) He suffers from hemangiomas on his neck, face and mouth, which cause him unwarranted pain and discomfort on a daily basis. (Id. at 2, 4.)

Plaintiff claims that Defendant Belavich was deliberately indifferent towards his medical needs. (Id.) Specifically, Plaintiff claims that Defendant Belavich deprived him of Neurontin, a prescribed medication that alleviates hemangioma-related pain. (Id. at 6.) Plaintiff contends that going without the "medication for more than a few days is Cruel and Unusual Punishment." (Id.) Plaintiff asserts that Defendant Belavich refused to process his Inmate/Parolee Appeal Form (CDC 602) and Reasonable Modification/Accommodation Request (CDC 1824). (Id. at 3.)

On August 22, 2005, Plaintiff submitted a CDC 602, stating:

**A. Describe Problem:** The problem is that on July 26, 2005 all my medications were renewed. But staff is refusing to give me my Neurontins - 900 mg 2x's a day. It has been a month now and I still have not received my medications which I really need due to the tumors in my neck. It should not take this long for my prescription to be signed off on. It's already been approved by Dr. Martin.

**B. Action Requested:** That I be given my medication Neurontin 900 mg 2x's a day right away. . . . That staff stop causing me pain and suffering by not giving me my proper medication.

(Compl. at 7, Ex. C.)

---

[1] Plaintiff's opposition to Defendant Belavich's motion was due no later than September 13, 2010, thirty days after Defendant Belavich filed his motion. The deadline has passed and, to date, Plaintiff has not filed his opposition. Even if Plaintiff later files a request for an extension of time to file his opposition, such a request would be denied as untimely.

3

Adhering to the administrative review process and its regulations under § 3084.2(b) of Title 15 of the California Code of Regulations (CCR), a CDCR employee (whose signature is illegible) reviewed the appeal at the informal level and stated on September 6, 2005: "I took over this area as of August 1, 2005. Pharmacy states inmate must be approved through Sacramento state pharmacy medical division." (Id.)

Plaintiff appealed to the first formal level of review on September 12, 2005, stating:

> Dissatisfied. That is not an excuse for the long delay in getting my meds. It is going on 2 months now. Your office is causing me undo [sic] pain which is considered cruel and unusual punishment. I have a history of needing this [sic] meds.

(Id.)

Sometime after September 12, 2005, the prescribed dosage of Neurontin was given to Plaintiff. (Id.) On October 21, 2005 at the first formal level of review, Senior MTA M. Hill-Culpepper explained that Plaintiff's appeal had been "granted" because he had been receiving the medication he requested. (Id.)

Plaintiff responded to MTA Hill-Culpepper and suggested that he should have his Neurontin prescription automatically refilled for an indefinite period of time. MTA Hill-Culpepper thus wrote, "You must submit a health services request form for a medication refill." (Id.) Another prison official, named M. W. Barker, approved the response. (Id.)

Although Plaintiff had already received the prescribed dosage of Neurontin that he requested, he appealed to the second level of review on October 27, 2005, stating:

> Dissatisfied. These reviewers have failed to answer the main problem. Why does it take so long to get this medication approved when my medical file shows I need this medication for pain relief from my tumors. My refills should be expedited due to my condition.

(Id.)

Defendant Belavich was the SQSP health care manager during the time of Plaintiff's pending CDC 602 appeal. (Belavich Decl. ¶ 3.) As health care manager, Defendant Belavich was responsible for responding to the 400-700 grievances received at the second level of review each month. (Id.) The procedure at the second level of review was that a clinician would investigate each inmate's concern and then draft a written report for the health care manager's review and approval. (Belavich Decl. ¶ 4.)

4

Because Plaintiff had received his prescribed dosage of Neurontin, the clinician who drafted the December 8, 2005 second level appeal response explained that Plaintiff's appeal was granted. (Compl., Ex. C.) That clinician also wrote that Plaintiff's attempt to raise at the second level of review a new issue (specifically, his concern about the possibility of potential problems in the delay of his future refills of Neurontin) failed the requirement that inmates attempt to resolve an issue at the lowest possible level of review. (Id.) According to Defendant Belavich, this requirement is necessary to ensure the efficiency of the inmate grievance system. (Belavich Decl. ¶ 7.) The clinician further wrote, "Based upon the totality of information, it is determined San Quentin's medical department is in full compliance with Title 15 of the CCR §3350 [regarding] Provision of Medical Care." (Compl., Ex. C.) Finding no reason to disagree with the clinician's medical opinions or factual findings, and no ongoing substantial or serious health risk to Plaintiff, Defendant Belavich signed off on the clinician's decision. (Belavich Decl. ¶¶ 4-8(2).)[2]

Again dissatisfied, Plaintiff appealed to the Director's level of review on January 4, 2006:

> First off I was never interviewed by Hill-Culpepper regarding this appeal. I've [tried] to resolve this problem at the lowest level but staff just dismisses my complaints even though my medication has now been given. I choose to continue this appeal because this is not the first time this delay in getting my medication has happened. I'm pretty sure it will happen again. So I need a record of my complaint against medical staff.
>
> Because Hill-Culpepper still did not answer my complaint as to why it takes over a month to get medication that has already been approved. I added new statements to my appeal to show that San Quentin medical staff has a history of this type of maltreatment towards inmates which is allowed. MTA Hill-Culpepper is just again trying to dismiss my problem because I have several appeals regarding this type of behavior by S.Q. medical staff.

(Compl., Ex. C.)

Plaintiff claims that when he receives Neurontin, the prescription covers only thirty to ninety days. Thus, Plaintiff claims that being required to complete a health services request form for a medication refill -- in order to be scheduled to see a doctor again once his prescription runs out-- is part of a "non-functioning system of bureaucracy" within SQSP and the CDCR. (Compl. at 6.) Plaintiff asserts that due to the bureaucracy's non-functionality, he has been deprived of his

---

[2] Defendant Belavich's declaration has two paragraphs numbered "8" on page three. Therefore, the Court has renumbered the paragraphs as "8(1)" and "8(2)."

5

medication for "days or weeks." (Id.)

In February, 2006, Defendant Belavich was transferred from SQSP in order to begin serving as chief executive officer of healthcare at CSP-Los Angeles County. (Belavich Decl. ¶¶ 1-3.)

On March 3, 2006, Plaintiff's CDC 602 was denied at the Director's level. Following an investigation by Appeals Examiner/Facility Captain J. Pearson, Inmate Appeals Branch Chief N. Grannis stated:

> The evidence presented provides that the appellant has access to medical services and medication deemed appropriate by medical personnel. CCR 15 § 3354 establishes that only qualified medical personnel shall be permitted to diagnose illness for inmates. In this particular matter, the medical records and professional staff familiar with the appellants medical history support the contention that the appellant is receiving adequate medical care/medication.

(Compl., Ex. C.)

## II.  **Legal Standard for Summary Judgment**

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. See id.

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id. If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted. See Liberty Lobby, 477 U.S. at 249-50. However, "self-serving affidavits are cognizable to establish a genuine issue of material fact so long as they state facts based on personal knowledge and are not too conclusory." Rodriguez, 265 F.3d at 902.

6

1    Once the moving party meets its initial burden, the nonmoving party must go beyond the
2 pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a
3 genuine issue for trial." Fed. R. Civ. P. 56(e). A dispute about a material fact is "genuine" if the
4 evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Liberty
5 Lobby, 477 U.S. at 248. If the nonmoving party fails to make this showing, "the moving party is
6 entitled to judgment as a matter of law." Celotex Corp., 477 U.S. at 323.

7    At summary judgment, the judge must view the evidence in the light most favorable to the
8 nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the
9 nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party
10 with respect to that fact. See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999). A court
11 may not disregard direct evidence on the ground that no reasonable jury would believe it. See id.
12 (where nonmoving party's direct evidence raises genuine issues of fact but is called into question by
13 other unsworn testimony, district court may not grant summary judgment to moving party on ground
14 that direct evidence is unbelievable). The district court may not resolve disputed issues of material
15 fact by crediting one party's version of events and ignoring another. Wall v. County of Orange, 364
16 F.3d 1107, 1111 (9th Cir. 2004). "By deciding to rely on the defendants' statement of fact [in
17 deciding a summary judgment motion], the district court became a jury." Id. But "[w]hen opposing
18 parties tell different stories, one of which is blatantly contradicted by the record, so that no
19 reasonable jury could believe it, a court should not adopt that version of the facts for purposes of
20 ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380-83 (2007) (police
21 officer entitled to summary judgment based on qualified immunity in light of video evidence
22 capturing plaintiff's reckless driving in attempting to evade capture which utterly discredits
23 plaintiff's claim that there was little or no actual threat to innocent bystanders).

**A.  Deliberate Indifference Claim**

  **1.  Applicable Legal Standard**

26    Deliberate indifference to serious medical needs violates the Eighth Amendment's
27 prohibition against cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976);
28 McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX

Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc); Jones v. Johnson, 781 F.2d 769, 771 (9th Cir. 1986). The analysis of a claim of "deliberate indifference" to serious medical needs involves an examination of two elements: (1) a prisoner's serious medical needs and (2) a deliberately indifferent response by the defendants to those needs. McGuckin, 974 F.2d at 1059.

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "wanton infliction of unnecessary pain." Id. (citing Estelle, 429 U.S. at 104). The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a serious need for medical treatment. Id. at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. Farmer v. Brennan, 511 U.S. 825, 837 (1994). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." Id. If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. Gibson v. County of Washoe, 290 F.3d 1175, 1188 (9th Cir. 2002).

In order for deliberate indifference to be established, therefore, there must be a purposeful act or failure to act on the part of the defendant and resulting harm. See McGuckin, 974 F.2d at 1060; Shapley v. Nevada Bd. of State Prison Comm., 766 F.2d 404, 407 (9th Cir. 1985). A finding that the defendant's activities resulted in "substantial" harm to the prisoner is not necessary, however. Neither a finding that a defendant's actions are egregious nor that they resulted in significant injury to a prisoner is required to establish a violation of the prisoner's federal constitutional rights, McGuckin, 974 F.2d at 1060, 1061 (citing Hudson v. McMillian, 503 U.S. 1, 7-10 (1992) (rejecting "significant injury" requirement and noting that Constitution is violated "whether or not significant injury is evident")), but the existence of serious harm tends to support an

inmate's deliberate indifference claims, Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing McGuckin, 974 at 1060).

Once the prerequisites are met, it is up to the fact finder to determine whether deliberate indifference was exhibited by the defendant. Such indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown in the way in which prison officials provide medical care. See McGuckin, 974 at 1062 (delay of seven months in providing medical care during which medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim).

### 2. **Analysis**

Plaintiff claims that Defendant Belavich's response to his second level appeal shows deliberate indifference to his serious medical needs. Specifically, Plaintiff alleges Defendant Belavich failed to prevent the delay in his receipt of Neurontin as well as any subsequent interruptions of his receipt of that medication by disregarding his request for expedited Neurontin refills.

Defendant Belavich acknowledges that Plaintiff suffers from hemangiomas. However, Defendant Belavich argues that Plaintiff fails to show that, during the course of responding to the second level appeal, he was deliberately indifferent to Plaintiff's serious medical needs.

In applying the first prong of McGuckin, the Court finds that Plaintiff exhibits a serious medical need because he suffers from hemangiomas.

In applying the second prong of McGuckin, the Court must find that Defendant Belavich was deliberately indifferent to Plaintiff's medical needs. Even if Plaintiff did suffer from a serious medical need, there is no evidence that suggests any purported deliberate indifference by Defendant Belavich in causing or contributing to any harm Plaintiff allegedly experienced due to the delay in being provided Neurontin.

Prison officials may exhibit deliberate indifference by delaying necessary medical treatment. McGuckin, 974 F.2d at 1060, 1062. Even if the delay in Plaintiff receiving Neurontin amounted to a constitutional violation, Plaintiff has presented no evidence that Defendant Belavich was responsible for this delay. See Walker v. Benjamin, 293 F.3d 1030, 1038 (7th Cir. 2002) (doctor entitled to

9

1  summary judgment where plaintiff presented no evidence that delays between plaintiff's initial visit,
2  diagnosis and visit to the specialist were within the doctor's control). As mentioned above,
3  Defendant Belavich held the title of heath care manager and was responsible for the administration
4  of health care to inmates at PBSP. The record shows that Defendant Belavich was not aware, at the
5  time he was responding to Plaintiff's inmate appeal at the second level of review, of any delay in
6  Plaintiff receiving Neurontin. In his declaration, Defendant Belavich states:

> Mr. Ramirez protested in that grievance that he needed, but was not receiving, Neurontin. By the time I first became aware of his concern, however, he was receiving the Neurontin he sought. His concern thus was resolved before I even became aware of it. I had no involvement in causing or contributing to the putative delay in his receipt of that (or any other) medication.

(Belavich Decl. ¶ 6.) Therefore, Plaintiff has failed to raise a triable issue of fact that Defendant Belavich was responsible for the delay in Plaintiff receiving Neurontin.

Additionally, the record shows that Defendant Belavich's response to Plaintiff's grievance at the second level of review constituted deliberate indifference to serious medical needs. Defendant Belavich based his decision on a clinician's fact finding. In light of the clinician's opinions that Plaintiff had been receiving adequate medical care, no constitutionally cognizable excessive health risk existed to which Defendant Belavich even theoretically could have been deliberately indifferent. Even assuming such a risk existed, there is no evidence to suggest that it was a risk of which Defendant Belavich had actual knowledge before it was resolved. As mentioned above, by the time Defendant Belavich first became aware of Plaintiff's grievance, Plaintiff was already receiving the prescribed dosage of Neurontin. (Id. ¶ 6.) It was therefore reasonable for Defendant Belavich to believe that Plaintiff was receiving adequate medical care for his hemangiomas.

Finally, the record shows that Defendant Belavich could not have been responsible for any subsequent interruptions of Plaintiff's receipt of Neurontin even if he disregarded Plaintiff's request for expedited Neurontin refills. In his declaration, Defendant Belavich claims that he lacked the ability to ensure expedited delivery of that medication, stating:

> The health care system at SQSP was such that inmates admittedly did not always receive medications on the date and time that, from a medical perspective, would have been most desirable. (That is the case in all care facilities, though SQSP was comparatively more problematic.) To ameliorate that situation, it would have been helpful to hire more staff, update and automate the pharmacy, introduce electronic

10

> ordering, and introduce electronic medical records (projects the federal receiver subsequently has been working on implementing). However, I lacked the ability or authority to do any of these things.

(Id. ¶ 8(2).) Therefore, Defendant Belavich was in no position to singlehandedly guarantee that Plaintiff would not experience delays in receiving his medication in the future. (Id.) Even if Plaintiff would have experienced a future interruption of his receipt of Neurontin, Defendant Belavich did not perceived this as

> posing a substantial risk of serious harm (or, for that matter, any likely harm) because:
>
> a) Most importantly, it was purely hypothetical. That a putative delay occurred in Mr. Ramirez's case previously was not an indicator that it was going to occur again. Also, many doctors decide patients who have been taking Neurontin should cease doing so, either temporarily or permanently, such that it was entirely possible that Mr. Ramirez's care providers soon would appropriately decide Neurontin was no longer indicated.
>
> b) The clinician who drafted the second level appeal response did not indicate to me that Mr. Ramirez's perspectives about a possible future delay evinced a likely or substantial risk to Mr. Ramirez. Pursuant to custom and practice, clinicians would have so indicated (either orally or in the draft response) if such a risk existed. I saw no reason not to agree with the clinician's implicit conclusion that no such risk existed in this context.
>
> c) Inmates commonly grieved about Neurontin in an attempt to loosen restrictions on their receipt of that drug for illegitimate reasons. Inmates, even those whom doctors thought Neurontin might help, crushed and snorted the drug to produce a methamphetamine-like high. For the same reason, the drug also was used as a form of black market currency. It thus was the most highly controlled medication in the prison system. Pursuant to policies over which I had no control: (i) orders for it had to be approved by the CDCR's Sacramento Division of Healthcare Services in Sacramento, and (ii) it was a "direct observation therapy," meaning care providers had to personally witness inmates swallow it to ensure they were not "cheeking" it (i.e., retaining it in their mouths for later misuse).

(Id. ¶ 8(1).)

Finally, even if Plaintiff claims he should have received different treatment for his medical needs by receiving expedited Neurontin refills, a difference of opinion as to the urgency and treatment of his medical needs is insufficient, as a matter of law, to establish deliberate indifference. See Toguchi v. Chung, 391 F.3d 1051, 1059-60 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Mayfield v. Craven, 433 F.2d 873, 874 (9th Cir. 1970). Although the medical treatment Plaintiff received may not have been what he considered proper treatment, Plaintiff

11

presents no evidence that Defendant Belavich was deliberately indifferent to his serious medical needs.

In sum, Defendant Belavich: (1) reviewed Plaintiff's grievance received at the second level of review; (2) noted that Plaintiff's appeal was granted because Plaintiff received the prescribed dosage of Neurontin; (3) found no reason to disagree with the clinician's medical opinions or factual findings, and determined there was no ongoing substantial or serious health risk to Plaintiff; and (4) ultimately signed the draft response to Plaintiff's appeal upon acknowledging that it was granted. Plaintiff has failed to raise a triable issue of fact that Defendant Belavich was responsible for the delay in Plaintiff receiving Neurontin or for any subsequent interruptions of his receipt of that medication. Consequently, there is no genuine dispute of material fact as to whether Defendant Belavich acted with deliberate indifference to Plaintiff's serious medical needs. Thus, Plaintiff has failed to provide evidence regarding an essential element of his deliberate indifference claim. Accordingly, the Court GRANTS Defendant Belavich's motion for summary judgment.

### 3. **Qualified Immunity**

In the alternative, Defendant Belavich argues that summary judgment is warranted because, as a government official, he is entitled to qualified immunity from Plaintiff's deliberate indifference claim.

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The threshold question in qualified immunity analysis is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was "clearly established." Pearson v. Callahan, __ U.S. __, 129 S. Ct. 808, 818 (2009) (overruling the sequence of the two-part test that required determination of a deprivation first and then whether such right was clearly established, as required by Saucier and holding that court may exercise its discretion in deciding which prong to address

1  first, in light of the particular circumstances of each case). Where there is no clearly established law
2  that certain conduct constitutes a constitutional violation, the defendant cannot be on notice that
3  such conduct is unlawful. Rodis v. City and County of S.F., 558 F.3d 964, 970 (9th Cir. 2009)
4  (applying Pearson to find no clearly established right before evaluating whether there was a
5  deprivation). The relevant, dispositive inquiry in determining whether a right is clearly established
6  is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he
7  confronted. Saucier, 533 U.S. at 202.

8  On these facts, viewed in the light most favorable to Plaintiff, Defendant Belavich prevails as
9  a matter of law on his qualified immunity defense because the record establishes no Eighth
10  Amendment violation. See Harlow, 457 U.S. at 818. However, even if a constitutional violation
11  had occurred with respect to Plaintiff's claim of deliberate indifference based on a delay in receiving
12  Neurontin, in light of clearly established principles at the time of the incident, Defendant Belavich
13  could have reasonably believed his conduct was lawful. See Estate of Ford v. Caden, 301 F.3d
14  1043, 1053 (9th Cir. 2002) (extending Saucier to Eighth Amendment claims). As mentioned above,
15  in the response to Plaintiff's second level appeal, Defendant Belavich acknowledges that Plaintiff's
16  initial appeal was granted as he was provided with the Neurontin medication that he initially
17  requested. Plaintiff's concern was resolved before Defendant Belavich even became aware of it.
18  Defendant Belavich had no involvement in causing or contributing to the delay in Plaintiff's receipt
19  of Neurontin.

20  Furthermore, even if a constitutional violation had occurred with respect to Plaintiff's claim
21  of deliberate indifference based on any subsequent interruptions of his receipt of Neurontin,
22  Defendant Belavich still could have reasonably believed his conduct of disregarding Plaintiff's
23  request for expedited Neurontin refills was lawful. Defendant Belavich does not dispute that
24  Plaintiff's right to be free from deliberate indifference to his serious medical needs was clearly
25  established during the period within which the injuries complained of occurred. However,
26  Defendant Belavich argues that "no legislative or judicial guidance existed with respect to the point
27  at which the risk of *some* harm ostensibly associated with the possibility of future appropriate
28  interruption in medication ostensibly became a 'substantial risk of serious harm.'" (Mot. for Summ.

13

1 J. at 13 (citing Estate of Ford , 301 F.3d at 1056; Saucier, 533 U.S. at 202).)

2     It is possible for a prison official to know all of the facts alleged by plaintiff and to understand that he cannot recklessly disregard a substantial risk of harm to a prisoner, and yet to mistakenly, though reasonably, perceive that the risk of harm is not too high; such an official is entitled to qualified immunity. Estate of Ford, 301 F.3d at 1049-50. In Estate of Ford, the Ninth Circuit granted qualified immunity to correctional officers where the information available to them about inmate's dangerous cellmate did not make it so clear that the cellmate would harm the inmate that no reasonable officer could have allowed them to be celled together. Here, as mentioned above, there was a lack of precedent indicating at what point the ostensible risk associated with a possible future inappropriate interruption in medication becomes constitutionally "substantial" or "serious." Therefore, it would not have been clear to a reasonable prison official in Defendant Belavich's position that his actions of disregarding Plaintiff's request for expedited Neurontin refills would be unlawful.

    Accordingly, Defendant Belavich is entitled to qualified immunity with respect to Plaintiff's deliberate indifference claim, and his motion for summary judgment is GRANTED on this ground as well.

## CONCLUSION

For the foregoing reasons,

1.     Defendant Belavich's motion for summary judgment (docket no. 49) is GRANTED.

2.     All claims against Defendant Calvo are dismissed without prejudice under Rule 4(m).

3.     The Clerk of the Court shall enter judgment, terminate all pending motions, and close the file. All parties shall bear their own costs.

4.     This Order terminates Docket no. 49.

IT IS SO ORDERED.

DATED: 9/28/10

*Saundra B Armstrong*
SAUNDRA BROWN ARMSTRONG
United States District Judge

G:\PRO-SE\SBA\CR.07\Ramirez4681.grantMSJ.frm -14-